Michelle THOMAS; David George Thomas; Tyneal Michelle Thomas; Shaldon Waide Thomas, Petitioners,

v.

John ASHCROFT, Attorney General, Respondent.

No. 02–71656.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 6, 2003.

Filed March 2, 2004.

Errol I. Horwitz and Edward M. Bialack, Woodland Hills, CA, for the petitioners.

Hillel R. Smith (argued) and Alison Marie Igoe (brief), Office of Immigration Litigation, Department of Justice, Washington, DC, for the respondent.

Before PREGERSON, FERNANDEZ, and BERZON, Circuit Judges.

## OPINION

PREGERSON, Circuit Judge.

This matter comes to us from the Board of Immigration Appeals ("BIA"). The petitioners seek review of the BIA's denial of their application for asylum and withholding of deportation. For the reasons discussed below, we grant the petition and remand.

### FACTUAL AND PROCEDURAL HISTORY

Michelle Thomas, her husband David Thomas, and their two children, Shaldon Thomas and Tyneal Thomas, are citizens and natives of South Africa. They entered the United States as visitors at Los Angeles, California on May 28, 1997. Apparently within one year of their arrival, they filed requests for asylum pursuant to § 208 of the Immigration and Nationality Act, 8 U.S.C. § 1158. Michelle Thomas is the principal asylum applicant; David, Shaldon, and Tyneal are derivative applicants.

At a hearing on December 2, 1998, the petitioners conceded their removability and requested asylum and withholding of removal. On May 12, 1999, the Immigration Judge ("IJ") held an evidentiary hearing. Michelle Thomas was the only petitioner who testified at the hearing.

Michelle testified that the petitioners came to the United States to avoid threats of physical violence and intimidation they were subjected to because of abuses com-

mitted by Michelle's father-in-law. Michelle's father-in-law, "Boss Ronnie," was a foreman at Strongshore Construction in Durban, South Africa. He allegedly was and is a racist who abused his black workers both physically and verbally.

At the hearing, Michelle testified about a number of events that support the petitioners' fears. The first took place in February 1996, when their dog was apparently poisoned. At the time of that incident they did not connect it with the conduct of Michelle's father-in-law. The next month, the petitioners' car was vandalized, and its tires were slashed, though nothing was taken out of the car. Apparently the police came, took fingerprints, and patrolled the area but did not do anything else. Michelle testified that the petitioners told her father-in-law about the incident, and that he told them he had just had a confrontation with his workers and that the petitioners should buy a gun.

In May of 1996, human feces were thrown at the door of the petitioners' residence while they were at home. After hearing the noise, the petitioners saw people running away. Apparently feces were left outside their front and back gates at other times after that. The petitioners then had higher fencing installed and bars put on their windows; they got a guard dog and requested additional police patrols.

In December 1996, Michelle's life was threatened. She describes the incident as follows:

> I was sitting on the veranda the one evening with my children playing in the front yard and a Black man had come up to me and asked me if I knew Boss Ronnie ... and he said to me he's come back and cut my throat. At that stage I'd taken the kids inside. The kids were very upset.... At this stage I was really, really fearing for my life.

Apparently the individual who approached Michelle was wearing overalls bearing a Strongshore logo.

Next, in March of 1997, Michelle was apparently outside of her gate, on the way to the store, when four black men approached her and tried to take her daughter from her arms. "[T]hey surrounded me and the next thing I knew is that they were trying to get Tyneal out my arms. I held her tight and fell to the ground with her...." The men apparently ran off after Michelle's neighbor had come out of his house in response to Michelle's screaming. Michelle testified that one of the men wore Strongshore overalls. She testified that, after this incident she was scared that "they were going to come back and either kill one of us or take one of my children." It was at that point that Michelle decided that she needed to leave.

In a declaration, Michelle also testified that her brother-in-law had his house broken into and his car vandalized several times, and that he and his family had received threats. She speculated that her family, rather than her father-in-law, was the subject of attacks because her father-in-law lived in what was essentially a "fortress." In addition to the evidence of particular attacks on their family, the petitioners also submitted evidence of the widespread crime problem in South Africa.

On August 30, 1999, the IJ denied the petitioners' request for asylum and withholding of removal. The IJ determined that the respondent was fearful for her life and the lives of her family "because she believes as a White citizen of South Africa that she is subject to persecution by Black citizens of South Africa.... The respondent's position is that she and her family are being attacked because of their race." In a decision that is somewhat imprecise, the IJ made a number of relevant statements. The IJ noted that South Africa

**1174**

has a high crime rate, but that "[i]t appears ... that the incidents of crime, attacks on individuals is not restricted to Blacks committing crimes against Whites." The IJ also noted that there is nothing to indicate that the South African government is "sponsoring or promoting or condoning violence of Whites against Blacks or Blacks against Whites or . any other group of people." The IJ also appears to have believed that there was nothing political in the attacks against the petitioner: "It does not say anything about the father-in-law's political position or the political position of the people who are allegedly persecuting them or committing these offenses against them."

While the IJ apparently accepted Michelle's statements as credible for certain purposes, the IJ noted that she did not find Michelle's testimony to be totally credible.

> There were some inconsistencies regarding some of the incidents. For example, there was confusion over whether the report of the vandalism was made to the police or not. Also, in her application for political asylum, in her declaration, it appeared that they were not clear as to the actual cause of death of the dog. That at one point the veterinarian said it looks like the dog had been poisoned, but even that in the declaration was not clear. It is still puzzling to the Court as well that the family would be targeted because of the father-in-law had been the foreman of this company for such a long period of time.... [T]he father-in-law has held these attitudes from years back and, therefore, he was probably as racist in 1986 as he was in 1996, so there is no explanation as to why these attacks against her family suddenly began in 1996.

The IJ concluded: "Therefore, ... the Court finds that the respondent has failed to meet her burden of proving, of demon-

strating that she and . her family suffered persecution in South Africa based on any of the five statutory grounds whether it is race or political opinion."

The petitioners filed a timely appeal to the BIA. On May 16, 2002, the BIA affirmed the decision of the IJ without opinion. The petition for review was filed with this court on June 11, 2002.

**STANDARD OF REVIEW**

■■■ We review the BIA's decision that an alien has not established eligibility for asylum or withholding of removal to determine whether it is supported by substantial evidence. *Wang v. Ashcroft*, 341 F.3d 1015, 1019–20 (9th Cir.2003); *see also Monjaraz–Munoz v. I.N.S.*, 327 F.3d 892, 895 (9th Cir.2003) ("We review the BIA's findings of fact, including credibility findings, for substantial evidence and must uphold the BIA's finding unless the evidence compels a contrary result."). While purely legal issues are reviewed *de novo*, the BIA's interpretation of immigration laws is entitled to deference. *Kankamalage v. I.N.S.*, 335 F.3d 858, 861–62 (9th Cir.2003). Where, as here, the BIA affirms the results of the IJ's decision without issuing an opinion, *see* 8 C.F.R. § 1003.1(a)(7), we review the IJ's decision. *See Falcon Carriche v. Ashcroft*, 350 F.3d 845, 851 (9th Cir.2003).

**ANALYSIS**

A. *Relevant Legal Standards*

1. *Asylum*

■■■ The Attorney General may grant asylum to an alien who qualifies as a refugee, that is, one who is unable or unwilling to return to her home country because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C.

§§ 1101(a)(42)(A), 1158(b)(1). Persecution is " 'the infliction of suffering or harm upon those who differ (in race, religion or political opinion) in a way regarded as offensive.' " *Prasad v. I.N.S.,* 47 F.3d 336, 339 (9th Cir.1995) (quoting *Desir v. Ilchert,* 840 F.2d 723, 726–27 (9th Cir.1988)). The "heavily fact-dependent" issue of persecution can be framed as follows: "looking at the cumulative effect of all the incidents Petitioner has suffered, [does] the treatment she received rise[ ] to the level of persecution[?]" *Singh v. I.N.S.,* 134 F.3d 962, 967 (9th Cir.1998). "Persecution need not be directly at the hands of the government; private individuals that the government is unable or unwilling to control can persecute someone" for purposes of asylum. *Id.* at 967 n. 9; *see also Hernandez–Montiel v. I.N.S.,* 225 F.3d 1084, 1097 (9th Cir.2000) ("Geovanni must show that the persecution he suffered was inflicted either by the government or by persons or organizations which the government is unable or unwilling to control.") (quotation marks omitted).

 "An alien's 'well-founded fear of persecution' must be both subjectively genuine and objectively reasonable." *Nagoulko v. I.N.S.,* 333 F.3d 1012, 1016 (9th Cir.2003). An alien satisfies the subjective component by credibly testifying that she genuinely fears persecution.[1] *Id.* To satisfy the objective component, an alien must show that she has suffered from past persecution or that she has a "good reason to fear future persecution by adducing credible, direct, and specific evidence in the record of facts that would support a reasonable fear of persecution." *Id.* (quoting *Duarte de Guinac v. I.N.S.,* 179 F.3d 1156, 1159 (9th Cir.1999)). "A finding of past persecution raises the presumption that an asylum-seeker has a well-founded fear of future persecution, rebuttable by a show-

ing, by a preponderance of the evidence, that conditions have changed sufficiently so as to overcome that presumption." *Rios v. Ashcroft,* 287 F.3d 895, 901 (9th Cir.2002). In order to rebut this presumption,

> [t]he INS is obligated to introduce evidence that, on an individualized basis, rebuts a particular applicant's specific grounds for his well-founded fear of future persecution. Information about general changes in the country is not sufficient. If the INS has not met its burden of production, it is unnecessary to remand this case to the BIA for further findings on this issue.

*Id.* (citations and quotation marks omitted).

### 2. *Withholding of Deportation*

 In order to qualify for withholding of deportation under 8 U.S.C. § 1231(b)(3)(A), the petitioners must establish a "clear probability," *Navas v. INS,* 217 F.3d 646, 655 (9th Cir.2000), that her "life or freedom would be threatened" upon return because of her "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). This "clear probability" standard, interpreted as meaning "more likely than not," is more stringent than asylum's "well-founded fear" because withholding of deportation is a mandatory form of relief. *Id.; see also Wang,* 341 F.3d at 1022 ("An applicant is entitled to withholding of removal under the INA if it is more likely than not that he or she will be persecuted based on one of the protected grounds if returned to the country of removal."). As in the context of asylum, "[a] determination of past persecution such that a petitioner's life or freedom was threatened creates a presumption of enti-

---

1. The subjective component is not at issue in this petition. The IJ found that "[t]he respon-

dent is fearful for her life and the life of her family...."

tlement to withholding of deportation." *Rios*, 287 F.3d at 903.

### B. *Credibility*

The government *does not* contend that the IJ's credibility determination was supported by substantial evidence. Instead, the government simply contends that, despite expressing concerns about Michelle's testimony, the IJ accepted the testimony as true for purposes of evaluating the petitioners' asylum claims.

The relevance of the IJ's concerns about Michelle's credibility is unclear. While the IJ apparently did accept the testimony as true for certain purposes, the IJ's concerns may nevertheless have played a role in her final determination. Therefore, we address the question whether the IJ's finding that Michelle's testimony was not "totally credible" is supported by substantial evidence.

██ ██ "Although the substantial evidence standard is deferential, the IJ must provide 'a specific cogent reason' for the adverse credibility finding." *Gui v. I.N.S.*, 280 F.3d 1217, 1225 (9th Cir.2002). In this case, the IJ pointed to three things: (1) alleged inconsistencies as to whether the vandalism was reported to the police, (2) lack of clarity about the cause of death of the dog, and (3) a question about why the attacks against the petitioners did not begin prior to 1996. The IJ's decision does not cite to specific portions of the transcript or record to support her concerns, and neither does the government.

As to the alleged inconsistencies regarding whether the vandalism was reported to the police: Michelle clearly stated at the hearing that the incident was reported to the police. Her declaration of October 5, 1998 also states that the petitioners reported the incident to the police. While certain testimony at the hearing only mentioned the filing of police reports with respect to the incident with the dog and the

attempted kidnapping, that testimony was in response to questions from the government attorney that only pertained to those events. Absent more clarity by the IJ or *any* support by the government, this basis for the IJ's credibility concerns is insufficient.

Similarly, the IJ's concerns about the dog poisoning are not supported by the record. Michelle's declaration states that a veterinarian told the petitioners that "he believed that [the dog] had been poisoned." Michelle testified to the same effect at the hearing, using the phrase: "the vet determined that the dog had been poisoned." These statements are not inconsistent. Moreover, in expressing concerns, the IJ only stated that "it appeared that they were not clear as to the actual cause of death of the dog." So stated, this does not go to Michelle's *credibility* but rather the question of whether the dog's death was actually part of the scheme of persecution. Therefore, the IJ's concerns about the dog's poisoning cannot support an adverse credibility determination.

██ ██ Finally, the IJ speculated as to why attacks on the petitioners had not begun prior to 1996. This speculation by the IJ cannot call into doubt the evidence in this case and serve as a basis for an adverse credibility determination. *See Paramasamy v. Ashcroft*, 295 F.3d 1047, 1052 (9th Cir.2002) ("An immigration judge's personal conjecture' cannot be substituted for objective and substantial evidence.'") (quoting *Bandari v. I.N.S.*, 227 F.3d 1160, 1167 (9th Cir.2000)).

Therefore, to the extent that such a determination is relevant to these proceedings, we find that any adverse credibility finding is not supported by substantial evidence.

## C. Past Persecution

1. *"On account of race, religion, nationality, membership in a particular social group, or political opinion"*

 In order to qualify for asylum or withholding of removal, the petitioners must establish that any persecution they suffered was on account of one of the five statutory grounds—race, religion, nationality, membership in a particular social group, or political opinion. Although far from clear in her ruling in this respect, the IJ apparently thought that the petitioners were claiming persecution based only on race or political opinion. Although the IJ refers to the five statutory grounds collectively, the IJ only explicitly referred to race and political opinion. The IJ wrote: "Therefore, ... the Court finds that the respondent has failed to meet her burden of proving, of demonstrating that she and her family suffered persecution in South Africa based on any of the five statutory grounds *whether it is race or political opinion.*" (Emphasis added.) The original asylum application, however, noted that the petitioners had been mistreated or threatened on the basis of political opinion

and membership in a particular social group. The box for "Race" was not checked.

 Although the petitioners' briefs are a little vague at times and they submitted documentary evidence related to race-based crime in South Africa, the petitioners do not appear to contend seriously that their race or political opinion was the basis for their persecution.[2] Moreover, it is unclear precisely what "political opinion" the petitioners espouse or are thought to espouse as well as how any claim based on race would appreciably distinguish them from others in South Africa. *See Vides-Vides v. I.N.S.*, 783 F.2d 1463, 1469 (9th Cir.1986) ("[T]he evidence should be specific enough to indicate that the alien's predicament is appreciably different from the dangers faced by the alien's fellow citizens."). Instead, the petitioners' best statutory ground—and the one they argue most forcefully—is membership in a particular social group, as relatives of Boss Ronnie. In the petitioners' words: "Respondent has ignored the overwhelming evidence showing that Petitioner Thomas and her family were persecuted by Black individuals, *precisely because of their familial relationship to her racist, white father-in-law.*" (Emphasis added).[3]

2. Consider, for instance, the following exchange, which took place during the hearing before the IJ:

Q. And you're saying that the workers weren't hurting you because of your race or your religion or membership in a political party or, or a—or your political opinion or special interest group, *is* that correct?

A. That's correct.

Q. Or nationality?

A. Yes.

Q. Right. It's just that they hated his father and wanted to come after you—

A. Yes.

3. As the government points out, at one point Michelle appeared to deny that the persecution was based on membership in a particular social group. Nevertheless, she consistently

stated that the persecution was based on her relationship to her father-in-law, and she should not be penalized for failing to recognize during questioning that that relationship can be articulated as one of the legally-recognized bases for relief from removal. Consider the following exchange:

Q. So, you say that all these things happened to you because of your father-in-law—

A. Yes.

Q. —correct? Not because of your race, your religion, your membership in a social group, a political opinion, any of those reasons. Only because of your father-in-law—

A. Father-in-law, yes.

Moreover, her application clearly states that her mistreatment was based on her membership in a particular social group.

██ ██ The question whether family relations may constitute a particular social group is a question on which the case law had been somewhat unclear. *See Gebremichael v. I.N.S.,* 10 F.3d 28, 36 n. 21 (1st Cir.1993) (noting that the state of the law on this issue in the Ninth Circuit "is not entirely clear"). However, we recently clarified that a family may constitute a "particular social group" for purposes of asylum or withholding of removal. *Lin v. Ashcroft,* 356 F.3d 1027, 1039, 2004 WL 112637, No. 02-70662 (9th Cir. Jan. 26, 2004); *see also Molina–Estrada v. I.N.S.,* 293 F.3d 1089, 1095 (9th Cir.2002) (noting that "[w]e have recognized that, in some circumstances, a family constitutes a social group for purposes of the asylum and withholding-of-removal statutes."); *Pedro–Mateo v. I.N.S.,* 224 F.3d 1147, 1151 (9th Cir.2000) ("Pedro–Mateo offers neither case law nor analysis to contradict our previous statement that the 'prototypical example' of a social group would be 'immediate members of a certain family.' ") (quoting *Sanchez–Trujillo v. I.N.S.,* 801 F.2d 1571, 1576 (9th Cir.1986)); *Mgoian v. I.N.S.,* 184 F.3d 1029, 1036 (9th Cir.1999) (we have held that a " 'particular social group' implies a collection of people closely affiliated with each other," with the "prototypical example of a 'particular social group' [ ] consist[ing] of the immediate members of a certain family. . . .") (quoting *Sanchez–Trujillo,* 801 F.2d at 1576). In *Lin,* we recognized that

> [w]here family membership is proposed as the "particular social group" status supporting a claim of refugee status, this prong of the test melds with the "on account of" prong. Where family membership is a sufficiently strong and discernible bond that it becomes the foreseeable basis for personal persecution, the family qualifies as a "social group."

356 F.3d at 1040.

██ In this case, the petitioners have demonstrated that the alleged persecution suffered was a result of the fact that they are related to Boss Ronnie. They are associated and identified with him by the perpetrators. The fact that Michelle's brother-in-law has also apparently suffered for the same reason lends support to this conclusion. Therefore, we find that the acts committed against the Thomases were sufficiently linked to their family membership so as to constitute alleged persecution on the basis of membership in a particular social group. In both *Lin* and the instant case, the petitioners' familial relations are a but-for cause of the alleged or feared persecution.

In this regard, the government contends that the alleged persecution was simply retaliation for personal conduct or the result of the country's high crime rate, and that neither basis is sufficient for asylum or withholding of deportation. Personal retaliation is different from other persecution for purposes of asylum and withholding of removal *precisely because it is action not tied to one of the statutory bases. Grava v. INS,* 205 F.3d 1177, 1181 n. 3 (9th Cir.2000) ("Purely personal retribution is, of course, *not persecution on account of political opinion.*") (emphasis added). Here, however, there are no allegations that the actions taken against the petitioners were simply retaliation for personal conduct, i.e., unrelated to any of the five statutory grounds. Instead, the evidence indicates that the actions were taken against them because of their relationship with Michelle's father-in-law. Given our conclusion that the petitioners' family qualifies as a "particular social group," the acts constituting persecution were not purely personal retribution against the petitioners; instead, they were actions *on account of* one of the statutory grounds.

With respect to the South Africa's crime rate, the petitioners need not (indeed, should not, *see Vides–Vides,* 783 F.2d at

1469) rely on any generalized crime trends to support their petition. Michelle consistently testified that the petitioners were subjected to personal attacks and threats based on their specific relationship to her father-in-law. While the petitioners also submitted evidence regarding general crime trends in South Africa, this evidence is unnecessary (as well as insufficient) to support their application. Therefore, we find the government's arguments insufficient to refute the contention that the persecution in this case was based on the petitioners' familial relations.

Based on the foregoing, we find that the alleged persecution suffered by the petitioners was on account of their membership in a particular social group. We find that substantial evidence does not support the BIA's determination that Michelle and her family did not suffer alleged persecution on any of the five statutory grounds.

### 2. *Persecution*

■■■ The Thomases must also demonstrate that the acts complained of constituted "persecution." The government contends that the incidents reported by the Thomases were not sufficiently extreme to constitute persecution. The government argues that "[s]everal of [the Thomases'] experiences could properly be described as harassment, and certain of the incidents may have qualified as crimes, but they were not persecution." We disagree.

Over the period of more than one year, the petitioners were subjected to an escalating scheme of intimidation and a real threat of physical violence. Their pet was killed. Their car and house were vandalized. In the presence of her children, Michelle was told that her throat would be cut. Their little girl was the target of a kidnapping.

We find that the cumulative effect of these events qualifies as an offensive suffering or harm. *See Prasad,* 47 F.3d at 339; *Singh,* 134 F.3d at 967. As noted above, the persecution inquiry is very fact-intensive. However, it has been held that "threats of violence and death are enough" to constitute persecution. *Cordon–Garcia v. I.N.S.,* 204 F.3d 985, 991 (9th Cir.2000).[4]

■■■ Next we must consider the government's role in the persecution. Persecution need not be directly at the hands of the government; private individuals that the government is unable or unwilling to control can persecute someone. *Singh,* 134 F.3d at 967 n. 9; *Navas,* 217 F.3d at 656, n. 10 ("Government action is not necessarily required; instead, police inaction in the face of such persecution can suffice to make out a claim.").

The IJ did not mention this standard and did not apply it. Rather than considering whether the government was unable or unwilling to protect the Thomases, the IJ considered whether "the South African government is sponsoring or promoting or condoning [the] violence." The IJ noted that the violence was not "government sponsored." The IJ then concluded that "the Court does not find that any of these

---

4. Judge Fernandez's penchant for *sesquipedalia verba*—or perhaps more appropriately *verba obscura*—does little to cloak the flaws in his dissent. Consider the dissent's footnote seven. As the facts indicate, the comparison of this case to a single drive-by shooting is silly. The petitioners were faced with multiple, escalating attacks over a year-long period. We do not pretend to be "porphyrogenites" (*noun, obscure:* originally referring to one born of the imperial family in Constantinople, more generally referring to one born into a royal family) issuing our own "ukases" (*noun:* a proclamation, decree, or order of a final or arbitrary nature by a Russian emperor). Rather, we follow well-established law regarding persecution, and, as discussed below, we remand for further consideration regarding whether the actions in this case qualify as "persecution" because of the alleged failure of the government to control the perpetrators.

actions by these people is sponsored by the South African government." We therefore remand to the BIA to apply the proper standard and determine in the first instance whether the South African police were indeed unwilling or unable to protect the Thomases. *See INS v. Ventura,* 537 U.S. 12, 16–17, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002).

## CONCLUSION

On the basis of the foregoing, we grant the petition for review and remand the case for further consideration.

FERNANDEZ, Circuit Judge, dissenting.

I dissent from the grant of the petition on multiple grounds.

First, in this circuit there is little authority for the proposition that a family, as such, is a social group,[1] and the use of that concept here shows just how poor an idea it is to extend social group status in that fashion.

Second, I see no basis for deciding that every blow or crime perpetrated against a person *is* persecutory, without any real consideration of who did it and why. If a disgruntled employee slugs his boss for cheating him out of his wages, that is decidedly not persecution. But, if the employee takes a cowardly swipe at his boss's daughter-in-law, that, according to the majority, is persecution. Of course, this is part and parcel of the anomaly wrought by the majority's decision that a family is a social group and, therefore, that the members ipso facto have a free-standing claim to refugee status.[2] It is also an emanation from the concept that just any wrongdoer can be dubbed a persecutor, which leads to the majority's next immigration law error.

Third, while we have said that persecution can be by groups, we have never, as far as I know, extended that concept to the point of saying that a few disgruntled employees, who attacked the hated boss's family, come within that group concept for asylum purposes.[3]

Fourth, there is no evidence that governmental authorities in South Africa are "unable or unwilling" to protect the Thomases, and others, from crimes committed against them. *See Singh v. INS,* 94 F.3d 1353, 1358–59 (9th Cir.1996); *Arteaga v. INS,* 836 F.2d 1227, 1231 (9th Cir.1988). It should be pellucid that no government, no police force, can possibly solve every crime. That is especially true of anonymous crimes of petty vandalism and of crimes where the victims cannot, or will not, help to identify the perpetrator. In fact, the Thomases actively asked that an investigation of the final alleged crime not be conducted. I recognize that the IJ used infelicitous language in reaching what, until today, was an ineluctable decision to deny relief, and that, at least, leads

---

1. Indeed, our law has generally been quite the contrary. *See Hernandez–Montiel v. INS,* 225 F.3d 1084, 1092 n. 4 (9th Cir.2000); *Estrada–Posadas v. INS,* 924 F.2d 916, 919 (9th Cir. 1991); *cf. Sangha v. INS,* 103 F.3d 1482, 1490–91 (9th Cir.1997) (attack on son because of father's position was not political persecution). That said, I am aware of *Lin v. Ashcroft,* 356 F.3d 1027, 1039–41, 2004 WL 112637, No. 02–70662 (9th Cir. Jan. 26, 2004), which I disagree with. *Lin* went a long way toward saying that a family *is* a social group, but there, at least, the whole government family planning program was of

a persecutory nature, and family planning is directed at families in a unique way.

2. At least other family group cases have tended to involve situations where an attack on the family member has been for reasons that would constitute persecution if the primary "victim" had been attacked. *See supra* n. 1. But this case shows what the sometimes attractive arguments in those cases can lead to.

3. Here, as far as the record shows, this dastardly and uncontrollable group consists of five (or maybe only four) individuals.

to a remand rather than to issuance of an outright decision that the Thomases are eligible for asylum and entitled to withholding. Still, the brazen facts are clear; but for the other mickle mistakes of immigration law in the majority opinion, there would be no reason whatsoever to remand this case to the BIA.[4]

Finally, the record cannot support a determination that the Thomases could not protect themselves by moving to another city in South Africa, rather than by coming all the way to the United States.[5] Would those employees really leave their jobs and pursue the Thomases all over South Africa? There is no reason to think so.[6]

In short, this case expands and extends general language in our cases almost beyond recognition in order to foster a grant of asylum to people who are in no proper sense true refugees. *See* 8 U.S.C. § 1101(a)(42)(A). It makes a mockery of the serious concerns that lie behind the virtually universal desire to protect people who are truly being persecuted in their own countries. Really, on the theory of this case, hundreds of United States citizens are being subjected to persecution every year because of attacks by criminal groups and others.[7] If Congress had wished to extend immigration benefits to all those who have been injured by others and are displeased with the conditions in which they find themselves at home, it could have. In the meantime, because we are not porphyrogenites we should not be issuing our own ukases rather than abiding by the laws that Congress did adopt. In other words, the significant errors of immigration law in this case will be found in the majority opinion rather than in the decisions of the BIA or the IJ.[8]

Thus, I must respectfully dissent.

---

4. There is no need to remand where that would be a futile act. *See Valderrama–Fonseca v. INS,* 116 F.3d 853, 857 (9th Cir.1997); *Chinnock v. Turnage,* 995 F.2d 889, 893–94 (9th Cir.1993); *Tejeda–Mata v. INS,* 626 F.2d 721, 726–27 (9th Cir.1980).

5. I recognize that the IJ did not reach this point—he had no need to do so. I mention it because it is obvious from the record and serves to evidence the radical nature of the decision in this case.

6. It is notable that the hated father-in-law had retired before the Thomases filed their petition for asylum—this further attenuates the possibility that the employees would seek out the Thomases.

7. Consider, for example, the not unusual Southern California situation where there is an unsolved drive-by shooting by a street gang into the family home or automobile of a rival gang member, who has crossed the gang in some way. Despicable and deplorable? Of course! Grounds for asylum for family members? Of course not! But it seems that the majority would say "yes."

8. It is a pity that the majority has also fallen into floccinaucinihilipilification of my word choices.