# United States Court of Appeals
## For the First Circuit

No. 04-1983

HIRUT NEGEYA,

Petitioner,

v.

ALBERTO R. GONZALES,* ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER

OF THE BOARD OF IMMIGRATION APPEALS

Before

Boudin, Chief Judge,
Torruella and Selya, Circuit Judges.

Genet Getachew on brief for petitioner.
Peter D. Keisler, Assistant Attorney General, Civil Division, Christopher C. Fuller, Senior Litigation Counsel, Office of Immigration Litigation, and C. Alexander Hewes, Jr., Attorney, United States Department of Justice, on brief for respondent.

July 27, 2005

_____

*Alberto R. Gonzales was sworn in as United States Attorney General on February 3, 2005.  We have therefore substituted Attorney General Gonzales for his predecessor in office as respondent in this matter.  See Fed. R. App. P. 43(c)(2).

**SELYA**, <u>Circuit Judge</u>.  The petitioner, Hirut Negeya, is an Ethiopian national.  She seeks judicial review of a final order of the Board of Immigration Appeals (BIA) denying her application for asylum and other relief.  Discerning no error, we deny her petition.

The facts are straightforward.  The petitioner entered the United States on August 29, 2000, using a counterfeit non-immigrant visa.  The Immigration and Naturalization Service immediately detained her and instituted removal proceedings.  <u>See</u> 8 U.S.C. § 1182(a)(6)(C)(i) (fraud or willful misrepresentation of a material fact) and <u>id.</u> § 1182(a)(7)(A)(i)(I) (alien not in possession of a valid unexpired immigrant visa).  She conceded removability but cross-applied for asylum, withholding of removal, and relief under the Convention Against Torture (CAT).

The case was heard on May 6, 2003.  The petitioner, born in Ethiopia on December 16, 1969, testified that she is unmarried and childless.  Her father is Amharic and her mother is an ethnic Eritrean.  After graduating from high school, she attended technical school for three years.  She then began work at the Water Resource Development Authority (WRDA) in 1991.

The WRDA, a government agency, dismissed the petitioner five years later.  Although her termination letter stated that she was being furloughed because she was a "contract worker" whose contract had expired, the petitioner concluded that  she would have

-2-

been retained but for her Amharic lineage. To bolster this conclusion, she noted that, at the time, many people of Amharic descent were being laid off by government agencies.

The loss of her job was not the only basis for the petitioner's apprehension. She testified that many Ethiopians of Amharic descent, including several former co-workers, had been detained by the government. Fearing that she also would be detained on account of her Amharic ethnicity, she left Ethiopia for Egypt. She made no effort to find other employment in Ethiopia. While in Egypt, she learned of her father's detention in Ethiopia on account of his connection with the Amharic political party.

The petitioner lived in Egypt from 1996 to August 2000. She worked as a babysitter and maid even though she did not have a work permit. Midway through this period, war broke out between Ethiopia and Eritrea over a long-disputed border. During the war, a large number of Eritreans were expelled from Ethiopia.

The war lasted for just over two years, culminating in an armistice negotiated in June of 2000. Documentary evidence in the record reflects that, from and after the date of the armistice, the Ethiopian government stopped forcibly deporting persons of Eritrean origin.

Despite the cessation of hostilities, the petitioner did not return home but, rather, remained in Egypt. When her employer left Egypt, she flew to the United States and, as said, entered

illegally.  She then sought asylum based primarily upon the fact that she was an Ethiopian of Eritrean origin.  In her own words, she "fear[ed] persecution by the Ethiopian government on account of [her] Eritrean lineage, as well as [her] connection with [her] father."  She stated conclusorily in her affidavit in support of her application for asylum that if she were to return to Ethiopia she would "be put in prison" and if her ethnic background was discovered, she would "not be allowed to work or earn a livelihood in [her] country, and . . . [would] likely be deported to Eritrea."

The petitioner's testimony was to the same effect.  She expressed a fear that if she returned to Ethiopia, she "would be a person who'd have no rights in that country, no rights to work, to rent a house, to live."  Instead, the Ethiopian government would consider her Eritrean and she would be deported.  To buttress these last conclusions, she noted that her mother and two younger sisters had been deported to Eritrea in 1998 because they were of Eritrean ethnicity.

The immigration judge (IJ) deemed the petitioner credible but nonetheless denied her application for asylum, withholding of removal, and relief under the CAT.  He found that the petitioner had not established past persecution because termination of employment and detention or deportation of family members "does not rise to the level of persecution contemplated by the Immigration and Nationality Act."  Similarly, the petitioner had not

established a well-founded fear of future persecution because, inter alia, changed conditions in Ethiopia rendered her trepidation groundless.

The petitioner appealed to the BIA, which summarily affirmed the IJ's ruling. This timely petition for judicial review followed. We have jurisdiction under 8 U.S.C. § 1252(b).

We start with the petitioner's asylum claim. When, as now, the BIA has summarily affirmed an asylum determination, this court will "review directly the IJ's decision as if it were the decision of the BIA." Jupiter v. Ashcroft, 396 F.3d 487, 490 (1st Cir. 2005). This appellate assessment implicates the substantial evidence standard of review. Under this standard, we must honor the IJ's findings as long as they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992). The decision below is then tested against the factual predicate, with the understanding that the decision must be upheld "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

In order to qualify for asylum, an alien bears the burden of showing that she is a refugee within the purview of the Immigration and Nationality Act (INA). See id. § 1158(b)(1); 8 C.F.R. § 208.13(a); see also Laurent v. Ashcroft, 359 F.3d 59, 63 (1st Cir. 2004). The INA defines a refugee as someone who is

unable or unwilling to return to her homeland "because of persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

If an asylum applicant is able to show past persecution, there is a rebuttable presumption that her fear of future persecution is well-founded. See 8 C.F.R. § 208.13(b)(1). In this instance, the petitioner has abandoned the argument that she suffered any cognizable past persecution. Consequently, the question before us reduces to whether she has a well-founded fear of future persecution. On that question, she bears the burden of showing, unassisted by any presumption, that her fear of future persecution is well-founded. Makhoul v. Ashcroft, 387 F.3d 75, 79 (1st Cir. 2004).

A well-founded fear of future persecution entails both subjective and objective components. The petitioner must demonstrate not only that she harbors a genuine fear of future persecution but also that her fear is objectively reasonable. Laurent, 359 F.3d at 65.

We assume, for argument's sake, that the petitioner satisfied the subjective component of the two-part test. That assumption brings us directly to the IJ's determination that the petitioner did not satisfy the second of the two prongs.

In order for an alien to show that her fear of persecution is objectively reasonable, she "must show 'by credible, direct, and specific evidence . . . facts that would support a reasonable fear that the petitioner faces persecution.'" Guzman v. INS, 327 F.3d 11, 16 (1st Cir. 2003) (quoting Alvarez-Flores v. INS, 909 F.2d 1, 5 (1st Cir. 1990)). Generally, this court "narrow[s] the relevant inquiry to whether a reasonable person in the asylum applicant's circumstances would fear persecution on account of a statutorily protected ground." Aguilar-Solis v. INS, 168 F.3d 565, 572 (1st Cir. 1999). Keeping this framework in mind, we conclude that the IJ's determination that the petitioner lacked an objectively reasonable fear of future persecution is supported by substantial evidence.

To begin, a petitioner must show that she fears persecution based on one of the five statutorily enumerated grounds. One of these is "membership in a particular social group." 8 U.S.C. § 1101(a)(42)(A). A social group is composed of members who "share a common, immutable characteristic." Da Silva v. Ashcroft, 394 F.3d 1, 5 (1st Cir. 2005). Groups satisfying this criterion typically include racial and ethnic groups. See id. The group to which the petitioner belongs — ethnic Eritreans[1] — may be

---

[1]For purposes of her "future persecution" claim, the petitioner emphasizes her Eritrean heritage rather than her Amharic heritage. We evaluate her case accordingly.

considered a "social group" for purposes of 8 U.S.C. § 1101(a)(42)(A).

That leaves the matter of persecution per se. The parameters of persecution are not set in cement, largely because the INA contains no hard-and-fast definition of persecution. In the absence of authoritative guidance, courts have taken a case-by-case approach to determining whether particular harms do — or do not — constitute persecution within the ambit of the statute. See, e.g., Bocova v. Gonzales, ___ F.3d __, __ (1st Cir. 2005) [No. 04-2175, slip op. at 8]. We know, however, that inconvenience, unpleasantness, and even a modicum of suffering may not be enough to meet that benchmark. See, e.g., Rodriguez-Ramirez v. Ashcroft, 398 F.3d 120, 124 (1st Cir. 2005); Nelson v. INS, 232 F.3d 258, 263 (1st Cir. 2000).

Here, the petitioner's allegations of possible future persecution come in two forms. First, she claims that she would have no right to work or even to live a normal life in her homeland. These claims, however, are not anchored in any factual foundation in the record. They might have some traction if the relevant time frame were the late 1990s, but it is not; the relevant time frame for present purposes is a more recent period (after the June 2000 armistice). With respect to that more recent period, the petitioner's allegations are entirely conclusory and, therefore, the IJ's rejection of them is sufficiently supported.

<u>See</u> 8 U.S.C. § 1252(b)(4)(B). On this record, a reasonable person in the petitioner's circumstances would have no continuing reason to fear such persecution.

The petitioner also avers that, if removed to Ethiopia, she will be forcibly deported or, at least, her right to travel will be lost because her passport will not be renewed. Once again, her claims do not withstand scrutiny.

The record reflects that soon before leaving Egypt to come to the United States in 2000, the petitioner had her Ethiopian passport renewed. There is credible evidence that the situation in Ethiopia has improved, not deteriorated, since that date. Thus, it is difficult to presume that a reasonable person would have a continuing fear that her passport would somehow be revoked or its renewal denied. To cinch matters, the petitioner has wholly failed to adduce any credible, direct, or specific evidence showing that the Ethiopian government, as matters now stand, would either revoke or refuse to renew her passport, let alone deport her against her will. Unsupported speculation that her passport might not be renewed or that she might be arbitrarily expelled falls far short of creating a well-founded fear of persecution.

The sockdolager is the evidence of changed country conditions. This evidence undermines the petitioner's argument that her fear of future persecution is objectively reasonable. When authoritative documentary evidence, such as State Department

country reports, shows convincingly that changed conditions in an alien's homeland have dissipated the threat of persecution, a stated fear of future persecution is no longer objectively reasonable. See Yatskin v. INS, 255 F.3d 5, 10 (1st Cir. 2001) (finding a State Department report that cited changed country conditions sufficient to debunk alien's claim of an objectively reasonable fear of persecution); Aguilar-Solis, 168 F.3d at 572-73 (similar). That is the situation here.

To be sure, the petitioner adduced evidence that her mother and siblings had been forcibly deported. But those deportations occurred in 1998. The IJ relied on the State Department report on human rights conditions for Ethiopia for the year 2002 (the Report) — a more recent and more relevant period. The Report states in pertinent part that "the [Ethiopian] Government stopped deporting forcibly Eritreans and Ethiopians of Eritrean origin after it signed the cessation of hostilities agreement with Eritrea in June of 2000." The Report also indicates that "[t]here were no reports of forced exile during the year [2002]" and that citizens no longer were "be[ing] deprived of their nationality against their wills." Temporally and legally, that evidence trumps the petitioner's earlier "family history" evidence.

In an effort to parry this thrust, the petitioner points to some contradictory reports. Generally, State Department reports are a highly probative source of evidence in cases that turn on the

objective reasonableness of an asserted fear of future persecution. See Gonahasa v. INS, 181 F.3d 538, 542 (4th Cir. 1999) (noting that country conditions are "directly within the expertise of the Department of State" (quoting Marcu v. INS, 147 F.3d 1078, 1081 (9th Cir. 1998))). In all events, choosing between conflicting reports in an immigration case is for the factfinder, not for the court of appeals. See id. The IJ was unpersuaded by the petitioner's proffers, and under the substantial evidence standard it is not our job to decide which of two conflicting sets of reports is more credible.

That ends the matter. In the absence of powerful contradictory evidence — and there is none in this record — the existence of the Report, which elaborates upon significant ameliorative changes in country conditions between the late 1990s and the post-armistice period, fills in the blanks left by the conclusory nature of the petitioner's testimony. So viewed, it suffices to provide the substantial evidence needed to underpin the IJ's determination that the petitioner failed to show an objectively reasonable fear of future persecution. Yatskin, 255 F.3d at 10.

The supportability of the decision denying asylum also disposes of the petitioner's claim for withholding of removal. A withholding of removal claim requires an alien to carry a weightier burden of proof than does a counterpart claim for asylum. See 8

-11-

U.S.C. § 1231(b)(3)(A); see also Makhoul, 387 F.3d at 82.  Thus, since the petitioner's claim for asylum fails, her counterpart claim for withholding of removal must fail as well.  See Laurent, 359 F.3d at 61 n.1.

The petitioner's final claim is unsuccessful for a different reason.  That claim, which invokes the CAT, was not developed in her appellate brief.  Consequently, it has been waived.  See Makhoul, 387 F.3d at 82.

We need go no further.  For the reasons elucidated above, we uphold the BIA's final order.

**The petition for judicial review is denied**.