# United States Court of Appeals
## For the First Circuit

No. 04-2207

ARTUR HARUTYUNYAN,

Petitioner,

v.

ALBERTO R. GONZALES,
ATTORNEY GENERAL OF THE UNITED STATES,

Respondent.

PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Boudin, <u>Chief Judge</u>,

Selya, <u>Circuit Judge</u>,

and Siler,* <u>Senior Circuit Judge</u>.

Kevin MacMurray on brief for petitioner.
Michael J. Sullivan, United States Attorney, and Jeffrey M. Cohen, Assistant United States Attorney, on brief for respondent.

September 2, 2005

*Of the Sixth Circuit, sitting by designation.

**SELYA**, **Circuit Judge**. The petitioner, Artur Harutyunyan, a native of Armenia, seeks review of a final order of the Board of Immigration Appeals (BIA) denying his application for asylum.[1] Concluding, as we do, that the BIA's order is supported by substantial evidence, we deny the petition.

The facts are uncomplicated. In June of 2001, the petitioner, then twenty years old, entered the United States under a J-1 visa to embark upon a work-study program. Having been lawfully admitted, he proceeded (again, lawfully) to acquire B-2 visitor status, which entitled him to remain until April 10, 2002.

The petitioner overstayed his departure deadline and, in June of 2002, applied for asylum. The Immigration and Naturalization Service responded by instituting a removal proceeding. The petitioner conceded removability.

At an ensuing hearing, an immigration judge (IJ) examined the petitioner's asylum application and the supporting documents submitted therewith (including the affidavit of an expert in Armenian politics and the 2002 State Department country report on human rights practices in Armenia). These exhibits showed a long history of conflict between Armenia and Azerbaijan. Those historic

---

[1]The petitioner originally sought withholding of removal as well as asylum. The IJ and the BIA ruled against him with respect to both claims. In this venue, the petitioner disputes only the adverse ruling on asylum. His claim for withholding of removal is, therefore, waived. See Makhoul v. Ashcroft, 387 F.3d 75, 82 (1st Cir. 2004).

problems were exacerbated by a war that raged from 1988 to 1994. During the war, both Armenians residing in Azerbaijan and Azeris residing in Armenia were confronted with varying degrees of violence and discrimination. As a result, many of the Azeris who had resided in Armenia — upwards of 185,000 individuals — fled to Azerbaijan. These ethnic tensions were heightened in 1998 following the election of a self-proclaimed chauvinist, Robert Kocharian, as president of Armenia. Notwithstanding these tensions, a few people of Azeri origin continue to reside in Armenia.

The petitioner testified against this general background. In his testimony, he noted that his mother is from Azerbaijan. Building on that foundation, he alleged that, in early 2001, he began experiencing attacks upon his person and assaults upon his financial well-being due to his Azeri ethnicity. He further alleged that these intrusions constituted ethnic persecution.

The petitioner mentioned three specific events. In January of 2001, a group of men spouting anti-Azeri ethnic slurs assaulted him. The men told him that he did not have a right to live in Armenia. This assault occurred in Yerevan (where the petitioner lived). The petitioner responded to it by altering his daily routine; he left home earlier in the morning to travel to class and he returned from work later at night in order to avoid unwanted confrontations.

All was well until an evening in March, when a group of men accosted the petitioner and struck him with knives and sticks. The marauders told him that he had been forewarned that violence would occur unless he and his Azeri relatives left Armenia. This time, the petitioner suffered significant injuries, which required a two-day hospital stay.

This incident prompted the petitioner's family to move to their summer home in rural Ashtarakh, approximately fifteen miles from Yerevan, in hopes of avoiding future trouble. The petitioner resided there from March until June of 2001 and regularly attended school. He experienced no further acts of violence against his person. On April 24, 2001, however, arsonists burned down his store in Yerevan. The petitioner testified that the same nucleus of individuals who had been involved in the two prior assaults also were involved in the arson.

The petitioner contemporaneously reported each of these incidents to the police. The incidents were all investigated; one case was closed for lack of evidence; and nothing has yet been resolved in connection with the other two incidents. The petitioner attributes this state of affairs to an unwillingness to prosecute based on his Azeri ethnicity. He concedes, however, that the police responded promptly to the news of the first incident, investigated it, filed a report, and told the petitioner that they would seek to find the miscreants and bring them to justice. He

also concedes that, following the second incident, the police again responded promptly, interviewed the petitioner in his hospital room, tracked down the perpetrators, and initiated criminal proceedings against them. These proceedings were pending when the petitioner absconded. Criminal proceedings also were initiated against the persons accused of committing the arson.

The arson proved to be the last straw for several of the petitioner's relatives. His brother and sister-in-law emigrated to Georgia and his parents moved to Russia. The petitioner claims that he was unable to accompany either set of relatives because he had not yet fulfilled Armenia's requirement for military service (and, thus, could not obtain an exit stamp).[2] The petitioner further testified that he could not meet his military service obligation because he would be murdered by anti-Azeri army officers. Faced with this Hobson's choice, the petitioner fled to the United States.

The IJ found the petitioner's testimony credible as to the raw facts, but nevertheless denied the application for asylum. In the IJ's view, the incidents that the petitioner described did not amount to past persecution.[3] The IJ also determined that the

_____

[2]It is undisputed that Armenian citizens who wish permanently to relocate outside of Armenia must obtain such an exit stamp.

[3]The parties' briefs indicate that the IJ determined that past persecution did occur. This interpretation is flawed. While the IJ stated preliminarily that the described acts "can" be deemed to be past persecution, she ultimately concluded that "the harm being

petitioner had failed to demonstrate a well-founded fear of future persecution. The BIA upheld the IJ's decision without authoring an independent opinion. This petition for judicial review followed.[4] We have jurisdiction under 8 U.S.C. § 1252(b).

When the BIA summarily affirms, this court reviews the IJ's decision "as if it were the decision of the BIA." Olujoke v. Gonzáles, 411 F.3d 16, 21 (1st Cir. 2005). Consequently, we focus the lens of our inquiry on the IJ's asylum determination. We employ the highly deferential "substantial evidence" standard of review. See Rodriguez-Ramirez v. Ashcroft, 398 F.3d 120, 123 (1st Cir. 2005); Makhoul v. Ashcroft, 387 F.3d 75, 79 (1st Cir. 2004). This means that the IJ's findings of fact must stand "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

In order to establish eligibility for asylum, an alien first must demonstrate that he is a refugee. See id. § 1158(b)(1); 8 C.F.R. § 208.13(a); see also Makhoul, 387 F.3d at 79. An immigrant is considered a refugee when he or she "is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, [the native] country because of

---

investigated by the authorities does not appear to constitute persecution."

[4]Alberto R. Gonzales was sworn in as United States Attorney General on February 3, 2005. We have therefore substituted Attorney General Gonzales as the respondent in this matter. See Fed. R. App. P. 43(c)(2).

persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101(a)(42)(A).  To attain refugee status, therefore, an asylum applicant must satisfy two fundamental criteria:  he must (i) qualify under one of the five protected grounds enumerated above and (ii) connect that ground to a well-founded fear of future persecution.  See 8 C.F.R. § 208.13; see also Da Silva v. Ashcroft, 394 F.3d 1, 4 (1st Cir. 2005).

Here, the petitioner claims that he experienced bodily injury and property damage due to his Azeri ethnicity.  That allegation, on its face, satisfies the "protected ground" element. Still, it is not enough for an asylum applicant to show that he has suffered harm on account of a protected ground; he also must satisfy the "well-founded fear" requirement.  This entails either (i) a showing of past persecution (which establishes a rebuttable presumption of a well-founded fear of future persecution) or (ii) independent proof of a well-founded fear of future persecution. See Da Silva, 394 F.3d at 4.  Either route requires that the applicant forge a link between the harm asserted and some governmental act or omission.  See id. at 7; Thomas v. Ashcroft, 359 F.3d 1169, 1179 (9th Cir. 2004).

Here, the IJ held that the petitioner had not successfully traveled either route.  In so holding, she emphasized

-7-

that the petitioner's antagonists were not government actors, that the Armenian government was responsive to and protective of Azeris during the relevant time frame, that the violence of which the petitioner complained was localized in nature, that the petitioner could return to Armenia free of an objectively reasonable fear of future attacks, and that his Azeri heritage posed no special danger in connection with future service in the Armenian military.

Against this mise-en-scène, we first address the petitioner's claim of past persecution. This claim rests on the three incidents recounted above. Because the IJ found the petitioner credible, we accept that those incidents occurred as described.

Importantly, however, the IJ found that all three incidents involved the same nucleus of individuals, under the hegemony of a single ringleader, and that the authorities responded appropriately on each occasion. These findings are supported by substantial evidence in the record. Indeed, they are supported by the petitioner's own testimony. These facts, in turn, adequately ground the IJ's ultimate conclusion that the three incidents did not add up to a showing of past persecution.

It is apodictic that, for asylum purposes, "not all horrific experiences translate into persecution." Rodriquez-Ramirez, 398 F.3d at 124. The incidents recounted here do not compel a finding of past persecution. The basic reason is that the

petitioner has not sufficiently connected them to the Armenian government.

Although persecution is a term of art that lacks precise definition in the immigration context, Negeya v. Gonzales, ___ F.3d ___, ___ (1st Cir. 2005) [No. 04-1983, slip op. at 8], persecution always implies some connection to government action or inaction. See Roman v. INS, 233 F.3d 1027, 1034 (7th Cir. 2000). This link may be forged in one of three ways: (i) by evidence that government actors committed or instigated the acts complained of; (ii) by evidence that government actors condoned the acts; or (iii) by evidence of an inability on the part of the government to prevent the acts. See id. (citing Galina v. INS, 213 F.3d 955, 958 (7th Cir. 2000)). In other words, the necessary connection may manifest itself in the execution of the persecuting acts themselves, in the condonation of those acts, or in an inability to prevent them. See Berishaj v. Ashcroft, 378 F.3d 314, 323 (3d Cir. 2004) (explaining that past persecution requires a showing either that the acts were committed by the government or that the government was unable or unwilling to control them); Bartesaghi-Lay v. INS, 9 F.3d 819, 822 (10th Cir. 1993) (similar); see also Da Silva, 394 F.3d at 7 ("Action by non-governmental actors can undergird a claim of persecution only if there is some showing that the alleged persecutors are in league with the government or are not controllable by the government."). The record here does not

compel a finding that any such governmental connection existed with respect to the incidents of which the petitioner complains.

The most telling datum is that (as the petitioner admitted) the local authorities responded immediately to each incident. Following the initial brouhaha, the police "promised [the petitioner] that they [would] definitely find and bring to justice [the] people who beat [him] up." After the second incident, the police succeeded in tracking down the malefactors and initiated criminal proceedings against them. And when the arson occurred, the police commenced an investigation, identified the alleged ringleader, and again instituted criminal proceedings.

To be sure, the petitioner complains that these endeavors did not pan out more favorably because of his Azeri ethnicity. But that complaint is woven entirely out of the gossamer strands of speculation and surmise. From aught that appears, the authorities made strong efforts to bring those responsible to justice and the absence of any convictions may have had more than a little to do with the fact that the petitioner — presumably the government's star witness — fled the jurisdiction.

To cinch matters, the petitioner experienced no violence while residing at his family's summer home. The IJ rejected the petitioner's proffered explanation for that phenomenon — that he was "in hiding" — because the petitioner, during his stay in Ashtarakh, made frequent public appearances, attended classes, and

-10-

sat for final examinations at the university. Noting that the incidents were confined to a particular area (Yerevan), the IJ supportably found that the violence was localized and carried out solely by a small band of local hoodlums. That is significant because a finding that violence is localized supports a determination that the violence does not constitute persecution. See Galicia v. Ashcroft, 396 F.3d 446, 448 (1st Cir. 2005); Da Silva, 394 F.3d at 7.

In sum, the IJ concluded that the incidents affecting the petitioner, though regrettable, did not as a matter of law constitute persecution at the hands of government officials, but, rather, abuse at the hands of a coterie of local hooligans. Given the lack of any connection between the incidents and any discernible governmental action or inaction, we deem this conclusion supported by substantial evidence. Consequently, we must uphold it. See INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992).

The supportability of the "no past persecution" determination brings us to the existence vel non of a well-founded fear of future persecution. On that issue, as on the issue of past persecution, the petitioner bears the burden of proof. See Negeya, ___ F.3d at ___ [slip op. at 6]. Because there is no sufficient showing of past persecution, the petitioner must carry that burden unaided by any affirmative presumption. Id. at __ [slip op. at 6].

-11-

A successful showing of a well-founded fear of future persecution must survive scrutiny from both subjective (genuine fear) and objective (objectively reasonable fear) standpoints. See id. at ___ [slip op. at 6]; Laurent v. Ashcroft, 359 F.3d 59, 65 (1st Cir. 2004). Given the IJ's favorable credibility determination, the petitioner easily satisfies the subjective component of this test. The objective component presents a more daunting challenge.

The petitioner rests his fear of future persecution principally on the fact that he will have to undergo compulsory military service should he return to Armenia (without performing military service, he would be unable to join his family in Russia).[5] The IJ disagreed that the petitioner had succeeded in showing that he would be unable to fulfill his military commitment safely. On that basis, she concluded that the petitioner's professed fear was not objectively reasonable. We test the validity of that conclusion.

Determining whether a fear of future persecution is objectively reasonable turns on "whether a reasonable person in the

_____

[5]It would not profit the petitioner to switch the focus of his "well-founded fear" argument from his obligation to perform military service to the incidents of violence that transpired in 2001. For one thing, as we have just explained, the IJ supportably found that those incidents did not amount to persecution. For another thing, the IJ's supportable finding that the violence was localized would itself refute such an argument, as it would mean that the petitioner retained a viable option of avoiding harassment by relocating elsewhere within Armenia.

asylum applicant's circumstances would fear persecution on account of a statutorily protected ground." Aquilar-Solis v. INS, 168 F.3d 565, 572 (1st Cir. 1999). In an effort to meet that benchmark, the petitioner presented the testimony of an expert in Armenian politics and testimony about his brother's past experience in the Armenian army. These presentations comprised a mixed bag.

The IJ did not consider the petitioner's expert to be an expert on Armenian military conditions. She nonetheless allowed him to testify, on the petitioner's behalf, that the Armenian army is a rough-and-tumble environment, in which a whole host of individuals, not just those of Azeri descent, are routinely harassed. Harassment occurs based on a wide variety of infelicitous causes, such as religion, sexual preference, failure to pay bribes, and a perceived lack of patriotism. The expert also testified that he had no knowledge of any Azeris being killed in the course of such harassment.

The evidence anent the petitioner's brother is not helpful to the petitioner's case. For two years, at the height of the hostilities between Armenia and Azerbaijan (1991-1993), the petitioner's brother served in the Armenian military without any untoward incident. This fact is some evidence that the petitioner could do the same.[6]

---

[6]The fact that the petitioner's brother may have been assisted by his father's officer-friend while in the army does not alter this conclusion. There has been no showing that the petitioner

-13-

On these facts, the IJ found that the petitioner could keep his military commitment without an objectively reasonable fear of persecution on account of his Azeri heritage. Given the evidentiary tapestry of the case as a whole, we cannot say that a reasonable factfinder would be compelled to reach a contrary conclusion. When the threat of violence afflicts all persons in a given situation, not just a particular social group or class, that threat will not support a finding of a well-founded fear of future persecution. See Ravindran v. INS, 976 F.2d 754, 759 (1st Cir. 1992) ("Generally, evidence of widespread violence and human rights violations affecting all citizens is insufficient to establish persecution."); Khalaf v. INS, 909 F.2d 589, 592-93 (1st Cir. 1990) (similar); Rodriguez-Rivera v. U.S. Dep't of Immig. & Natural'n, 848 F.2d 998, 1006 (9th Cir. 1988) (similar).

Our journey is not yet complete. In his brief to this court, the petitioner laments that his testimony was improperly interpreted. Despite his generalized claim that improper interpretation occurred "throughout the [asylum] hearing," his brief specifically mentions only one instance of allegedly improper interpretation — the petitioner's statement that "the case didn't get any closure" — and does not suggest a more precise translation.

When examining a claim of improper interpretation, we must ask whether a more proficient or more accurate interpretation

could not benefit from such family connections as well.

-14-

would likely have made a dispositive difference in the outcome of the proceeding.  See Singh v. Ashcroft, 367 F.3d 1139, 1144 (9th Cir. 2004); Perez-Lastor v. INS, 208 F.3d 773, 780 (9th Cir. 2000). Here, we answer that question in the negative, as the IJ's "no past persecution" finding is amply supported by unchallenged evidence in the record.

The fact that the BIA adopted the IJ's opinion without addressing the petitioner's improper interpretation claim does not alter our conclusion.  The BIA is free to take such a stance when it reasonably concludes that "any errors in the decision under review were harmless or nonmaterial," 8 C.F.R. 1003.1(e)(4)(i). That principle applies here.

We need go no further.  After careful evaluation of the briefs, the record, and the petitioner's claims, we conclude that the IJ's decision (and, thus, the BIA's affirmance of that decision) is both supported by substantial evidence and not otherwise infected by reversible error.

**The petition for judicial review is denied**.