**Juan Carlos CHÁVEZ– OLIVA, Petitioner,**

v.

**Alberto R. GONZÁLES, Attorney General of the United States, Respondent.**

**No. 05–2609.**

United States Court of Appeals, First Circuit.

Aug. 11, 2006.

---

Donald H. Barnes, on brief for petitioner.

Michael P. Sady, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, on brief for respondent.

Before BOUDIN, Chief Judge, TORRUELLA and HOWARD, Circuit Judges.

TORRUELLA, Circuit Judge.

Petitioner Juan Carlos Chávez–Oliva ("Chávez–Oliva") asks us to review a decision of the Board of Immigration Appeals ("BIA") dismissing Petitioner's appeal from an Immigration Judge's ("IJ") order, which denied Chávez–Oliva's application for asylum and withholding of removal. We deny the petition for review.

## I. Background

Chávez–Oliva is a native and citizen of Guatemala who entered the United States without inspection on September 15, 1994, near San Ysidro, California. On October 19, 1994, he filed an application for asylum and withholding of removal based on alleged political persecution in his native Guatemala.[1] In the application itself, Chávez–Oliva described how his membership in "a political party" led to threats against his life by "another political party" and at least one assault by armed men. However, the application lacked details as to the precise nature and extent of the alleged persecution.

On August 17, 1999, the Immigration and Naturalization Service ("INS")[2] served Chávez–Oliva with a Notice to Appear, commencing removal proceedings against him for presence in the United States without being admitted or paroled, pursuant to § 212(a)(6)(A)(i) of the Immigration and Nationality Act ("INA"). 8 U.S.C. § 1182(a)(6)(A)(i). At a subsequent hearing before the IJ, Chávez–Oliva admitted the factual allegations against him, conceded removability, and expressed his desire to continue with his asylum application. Following several continuances for preparation of counsel, Chávez–Oliva finally testified at a hearing on November 7, 2002.

In his testimony, Chávez–Oliva described several instances of violence and threats against him, his family, and his friends, purportedly because of their political affiliations. For example, he testified that political opponents assassinated his

---

1. Chávez–Oliva's wife, Greys Oneida Chávez, applied for asylum at a later date, but she made no independent claim of persecution. As a result, her claim rests solely on the merits of her husband's claim.

2. In March 2003, the relevant functions of the INS were transferred to the new Department of Homeland Security and reorganized as the Bureau of Immigration and Customs Enforcement.

brother in 1986. Chávez–Oliva also asserted that his membership in the Christian Democratic Party ("CDP") sparked personal encounters with certain opposition groups, namely the Guatemalan Revolutionary Front and UM Central Unity.

Chávez–Oliva indicated that one such encounter occurred in June 1994 while he and a fellow party member, Francisco, were traveling in a pick-up truck containing political paraphernalia, including party literature and a sound system owned by the CDP. Chávez–Oliva testified that the vehicle came under fire by unknown assailants, forcing the occupants to flee the truck. The shooters then proceeded to loot the vehicle of the political literature and sound system. Although Chávez–Oliva attempted to characterize the attack as political in nature, he admitted that he did not know for certain whether his political opinion in fact motivated the attack, or if it was simply a random criminal act.[3]

According to Chávez–Oliva, he also received several threatening letters and telephone calls from unknown individuals throughout the summer of 1994. Moreover, he claimed that on August 26, 1994, several masked men broke into his house, bound him and his father, and struck him in the head with a rifle butt. The attackers then demanded that Chávez–Oliva leave the country, and they stated they would kill Chávez–Oliva if the CDP performed well in upcoming elections. Following this encounter, he contacted the police, but the investigation was soon dropped by the local judicial authority because of the incident's apparent political connections.

Chávez–Oliva testified that he then fled Guatemala, fearing for his life. He further asserted that he remained fearful of returning to his native land at the time of the hearing in front of the IJ, some eight years after his initial departure. In support of this ongoing apprehension, he alleged that violence persists in the country and that his political associate and friend, Francisco, was killed shortly after returning to Guatemala from the United States. However, he offered no explicit evidence that the death was politically motivated.

Following the hearing on November 7, 2002, the IJ issued an order denying Chávez–Oliva's application for asylum and withholding of removal and granted him voluntary departure. While the IJ was "convinced that an incident occurred in which [Chávez–Oliva] was assaulted in the family home," she did not find sufficient evidence to connect the home invasion, or any of the other incidents, to Chávez–Oliva's political opinion. The IJ also found that the events, even if true, still did not require Chávez–Oliva to depart Guatemala in order to ensure his safety. Finally, the IJ held that even if past persecution existed, no evidence indicated that the threat persisted "under the circumstances, as they currently exist in Guatemala." Thus, the IJ found that even assuming Chávez–Oliva's testimony to be credible, the facts still did not warrant the granting of asylum.

Chávez–Oliva then appealed to the BIA, contending the record as it stood was sufficient to grant asylum and objecting to the IJ's failure to admit certain documentary evidence, most notably newspaper articles describing the then-current conditions in Guatemala.[4] On May 10, 2004, the BIA

---

**3.** Before the IJ, opposing counsel asked, "So it's entirely plausible they were just bandits who wanted to steal what was in your truck, is that correct?" In response, Chávez–Oliva answered, "Could be."

**4.** Chávez–Oliva's Notice of Appeal to the BIA listed several documents that he alleged the IJ

issued a decision dismissing Chávez–Oliva's appeal. The BIA highlighted the striking lack of detail in his asylum application when compared to his testimony before the IJ. This inconsistency in Chávez–Oliva's two separate accounts of his ordeal led the BIA to question the credibility of his claim. The BIA went on to note that the various threatening letters he offered as evidence carried little weight because they were unable to ascertain when the letters were sent or by whom. Finally, the BIA dismissed Chávez–Oliva's claim that the IJ erred in failing to admit the newspaper articles detailing the current conditions in Guatemala, finding that such conditions were immaterial once the BIA ruled that Chávez–Oliva failed to show a prima facie case of eligibility for asylum.

Following the BIA's decision, Chávez–Oliva appealed to this Court. However, the Government moved to remand to the BIA for further clarification, noting the record contained a document the BIA failed to address and which Chávez–Oliva treated as material to his appeal. The relevant document was an order from a Guatemalan magistrate corroborating Chávez–Oliva's account of the official investigation into the August 1994 home invasion being called off because of "political connections." Furthermore, the Government wanted the BIA to address the IJ's findings regarding changed country conditions in Guatemala. We granted the Government's motion, vacated the deportation order, and remanded to the BIA for further proceedings consistent with the Government's motion.

On September 23, 2005, the BIA again issued a decision dismissing Chávez–Oli-

va's appeal and addressing the concerns raised by the Government. As to the Guatemalan court document, the BIA first stated that violence stemming from "political connections" is not necessarily equivalent to persecution based on "political opinion," only the latter of which may trigger asylum eligibility. *See* 8 U.S.C. § 1101(a)(42)(A). Next, the BIA stated that even if Chávez–Oliva's political opinion motivated the attack contained in the report, the harm was "marginal" and did not rise to the level of persecution. Finally, the BIA held that even assuming the attack constituted past persecution, conditions in Guatemala have changed such that Chávez–Oliva no longer possesses a well-founded fear of persecution. *See id.*; *Quevedo v. Ashcroft*, 336 F.3d 39, 44 (2003); 8 C.F.R. § 208.13(b)(1)(i)(A).

Following this second decision by the BIA, Chávez–Oliva again made a timely appeal to this Court. It is on this appeal that we now review his case, nearly twelve years after he originally applied for asylum and withholding of removal.

## II. Discussion

In order to be eligible for asylum, an alien bears the burden of proving that he meets the statutory definition of a "refugee." 8 U.S.C. § 1158(b)(1); *Aguilar–Solís v. INS*, 168 F.3d 565, 569 (1st Cir.1999). A "refugee" is any individual outside of his country of nationality "who is unable or unwilling to return to ... that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion...." 8 U.S.C. § 1101(a)(42)(A). Thus,

---

erroneously failed to admit, including: a marriage certificate, the birth certificate of his daughter, CDP membership cards, the death certificate of his brother, the death certificate of Francisco, and a *court report of the inci-*

dent from August 1994. However, in his brief to the BIA, he only mentioned the IJ's decision not to allow certain newspaper articles describing instances of violence in Guatemala.

an alien seeking asylum must demonstrate that he either suffered past persecution or possesses a well-founded fear of future persecution. 8 C.F.R. § 208.13(b).

In order to prove past persecution, the asylum-seeker must present "conclusive evidence" that the persecutors targeted him because of at least one of the five protected categories. *Fesseha v. Ashcroft,* 333 F.3d 13, 18 (1st Cir.2003); *Albathani v. INS,* 318 F.3d 365, 373 (1st Cir.2003). The harm suffered by the individual must be more than mere annoyance or harassment, but may be less than a total deprivation of freedom or life. *See Aguilar–Solís,* 168 F.3d at 570. Beyond that, courts generally make the determination of whether certain conduct constitutes persecution on an *ad hoc* basis. *See id.*

Once an asylum applicant makes a showing of past persecution, a statutory presumption of a well-founded fear of future persecution arises. *Yatskin v. INS,* 255 F.3d 5, 9 (1st Cir.2001); 8 C.F.R. § 208.13(b)(1). However, the Government may rebut this presumption by showing by a preponderance of the evidence that either: 1) the fear is no longer well-founded because of a fundamental change in circumstances within the applicant's country of nationality, or 2) the asylum-seeker may safely and reasonably relocate to another part of that country. 8 C.F.R. § 208.13(b)(1)(i)-(ii).

Alternatively, the asylum-seeker may show a well-founded fear of future persecution directly, without proving past persecution. *See Palma–Mazariegos v. Gonzáles,* 428 F.3d 30, 34–35 (1st Cir.2005). To do so, the applicant must demonstrate that his fear of future persecution is both subjectively genuine and objectively reasonable. *See id.* at 35. Furthermore, as with past persecution, the anticipated conduct must be motivated by one of the five statutorily protected grounds, and the

harm foreseen must rise to the level of persecution. *See* 8 U.S.C. § 1158(b)(1)(B)(i); 8 C.F.R. § 208.13(b).

### A. *Standard of Review*

We review factual findings of the BIA under a substantial evidence standard. *Guzmán v. INS,* 327 F.3d 11, 15 (1st Cir. 2003). Under this standard of review, the BIA's holding regarding an alien's eligibility for asylum is unassailable if "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elías–Zacarías,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). Thus, we will only upset the BIA's determination on the matter if "the record evidence would compel a reasonable factfinder to make a contrary determination." *Aguilar–Solís,* 168 F.3d at 569.

### B. *Past Persecution*

■ Substantial evidence existed for the BIA to conclude that the harm alleged by Chávez–Oliva did not rise to the level of past persecution. First, by his own testimony, the June 1994 incident—in which unknown assailants shot at and robbed Chávez–Oliva—may not have been politically motivated. As noted, proving persecution requires the alien to establish by "conclusive evidence" that the persecutors targeted the individual because of one of the five protected grounds. *Fesseha,* 333 F.3d at 18 (citations and internal quotation marks omitted). In keeping with this requirement, "[t]his Circuit has rejected the contention that pervasive non-political criminality in Guatemala constitutes a basis for asylum." *Quevedo,* 336 F.3d at 44.

Second, although an assault appears to have taken place in August 1994 in which Chávez–Oliva was struck once in the head, the existence of some physical abuse does not necessarily indicate that persecution occurred, even if the attack was politically

motivated. Establishing that certain conduct amounts to persecution is a difficult burden to meet, *see Guzmán,* 327 F.3d at 15, and isolated incidents of abuse often do not overcome this threshold.[5] *See id.* at 16 (holding that a "one-time kidnapping and beating falls well short of establishing 'past persecution'"); *Nelson v. INS,* 232 F.3d 258, 264 (1st Cir.2000) (upholding an IJ's finding that three separate incidents of detainment, each accompanied by physical abuse, did not rise to the level of persecution); *Ravindran v. INS,* 976 F.2d 754, 756–60 (1st Cir.1992) (persecution not found where member of minority ethnic group had been interrogated and beaten for three days in prison and warned about pursuing political activities). "To qualify as persecution, a person's experience must rise above unpleasantness, harassment, and even basic suffering." *Nelson,* 232 F.3d at 263. Thus, given the deference due the BIA and the relatively stringent asylum standards, we are not compelled to overturn the BIA's determination that the degree of harm suffered by Chávez–Oliva in the alleged assault "[did] not rise to the level of past persecution."

## C. *Well–Founded Fear of Future Persecution*

 Having failed to demonstrate the existence of past persecution, Chávez–Oliva is not entitled to the presumption of a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1). Nevertheless, he may show a well-founded fear directly by demonstrating a genuine, subjective fear of future persecution that is also objectively reasonable. *Palma–Mazariegos,* 428 F.3d

at 35. While Chávez–Oliva may in fact have a genuine fear of future persecution, substantial evidence existed for the BIA to conclude that this fear was not objectively reasonable.

Political conditions in Guatemala have changed considerably since Chávez–Oliva's departure nearly twelve years ago. In 1996, opposing factions signed peace accords, and in 1997, a new, more independent, civilian police force was created. *See* United States Department of State, Bureau of Democracy, Human Rights, and Labor, *Country Reports on Human Rights Practices–2001: Guatemala* (2002). Following the 1996 peace accords, militant guerilla groups entered the political process. Moreover, a reformed police force may indicate a reduction in the instances of politically motivated persecution. If nothing else, these developments tend to indicate that the political strife present in Guatemala when Chávez–Oliva departed in 1994 has subsided to a significant degree.

Nonetheless, Chávez–Oliva takes issue with the BIA's characterization of conditions within Guatemala, and faults the BIA for over-emphasizing certain aspects of the State Department's Country Report on Guatemala ("Country Report"). *See generally id.* We believe, however, the BIA's use of the Country Report was in no way inappropriate. This Court has recognized that the reports "are generally probative of country conditions," *see Palma–Mazariegos,* 428 F.3d at 36, and, in turn, country conditions "often speak volumes about the objective reasonableness of an alien's fear [of] persecution." *Aguilar–Solís,* 168 F.3d at 572. As a result, the reports can "outweigh[ ] the petitioner's conclusory as-

---

5. We recognize that certain threatening letters and phone calls allegedly received by Chávez–Oliva in the summer of 1994 could suggest that the August 1994 assault was not in fact isolated. However, this is not a necessary interpretation of the record. The BIA noted that the letters were unsigned, undated, generally uncorroborated, and, therefore, carried little weight. Given the deference due the BIA and the fact Chávez–Oliva does not specifically contest the BIA's treatment of this evidence in his brief, we are not compelled to contradict the interpretation of these letters set out below.

sertions of continuing danger," *id.* at 572–73, and may be sufficient in themselves to demonstrate the unreasonableness of an alien's fear of persecution. *See Palma–Mazariegos,* 428 F.3d at 36.[6]

Furthermore, this Court has recently upheld changed country conditions within Guatemala, specifically the signing of the 1996 peace accords, as a sufficient reason to deny asylum claims based on political opinion. *See id.* at 35–36 (finding the peace accords effectively removed the source of the Guatemalan asylum-seeker's fear of persecution); *Guzmán,* 327 F.3d at 16 (noting that in part because the civil war had ended in 1996, the BIA "supportably concluded" that a Guatemalan citizen failed to show asylum eligibility). While problems admittedly persist in Guatemala, we are not compelled to overturn the BIA's determination that any continued violence in Guatemala lacks an identifiable relationship to Chávez–Oliva or his political activities, and thus cannot constitute persecution. *See Palma–Mazariegos,* 428 F.3d at 37 (noting that to the extent that "violence and human rights abuses still occur in Guatemala," the threat exists generally "regardless of . . . membership a particular group or class").

■ Several other factors support a finding that Chávez–Oliva's fear of future persecution is not objectively reasonable. First, several of his brothers continue to live in Guatemala, with no indication of any persecution or threat thereof. The fact that close family members continue to re-side in the country without incident tends to undercut Chávez–Oliva's fear that persecution awaits his return. *Aguilar–Solís,* 168 F.3d at 573. Second, the record suggests Chávez–Oliva was only a low-level member of the CDP, and it seems unlikely that he would be remembered for his short stint of political activism should he return to Guatemala. *See, e.g., Khem v. Ashcroft,* 342 F.3d 51, 54 (1st Cir.2003) (citing fact that the asylum-seeker was only a low-level party member and never held office as evidence supporting IJ's conclusion that she did not possess a well-founded fear of future persecution). Third, the mere fact that Chávez–Oliva has been absent from Guatemala for over a decade significantly decreases the likelihood that he would be harmed on account of political opinions he expressed so long ago. *See, e.g., Palma–Mazariegos,* 428 F.3d at 37 n. 2. These factors, coupled with the changed country conditions within Guatemala, lead us to conclude that substantial evidence existed for the BIA to find that Chávez–Oliva failed to establish an objectively reasonable fear of future persecution.[7]

## III. Conclusion

For the foregoing reasons, we deny Chávez–Oliva's petition for review and affirm the BIA's decision.

*Affirmed.*

---

6. *Palma–Mazariegos* states that in some cases, country reports alone may rebut the presumption of a well-founded fear of future persecution that arises from a showing of past persecution. Since the reports can overcome this statutory presumption, they must also be capable of demonstrating the unreasonableness of a fear of future persecution that lacks the benefit of such a legal presumption.

7. Having found Chávez–Oliva ineligible for asylum, we must also reject his claim for withholding of removal. Because the standard for withholding of removal is more stringent than the standard for asylum, "a petitioner unable to satisfy the asylum standard fails, a fortiori, to satisfy the [withholding of removal standard]." *Mediouni v. INS,* 314 F.3d 24, 27 (1st Cir.2002) (internal quotation marks omitted) (quoting *Álvarez–Flores v. INS,* 909 F.2d 1, 4 (1st Cir.1990)).