# United States Court of Appeals
## For the First Circuit

---

No. 11-1711

DUMITRU GILCA,

Petitioner,

v.

ERIC H. HOLDER, JR., ATTORNEY GENERAL,

Respondent.

---

PETITION FOR REVIEW OF AN ORDER OF THE

BOARD OF IMMIGRATION APPEALS

---

Before

Howard, Selya and Lipez,
Circuit Judges.

---

Gary J. Yerman on brief for petitioner.
Tony West, Assistant Attorney General, Civil Division, Anthony W. Norwood, Senior Litigation Counsel, and Wendy Benner-León, Trial Attorney, Office of Immigration Litigation, on brief for respondent.

---

May 23, 2012

---

**SELYA, Circuit Judge.** The petitioner, Dumitru Gilca, is a native and citizen of Moldova. He seeks judicial review of a final order of the Board of Immigration Appeals (BIA) denying his application for asylum, withholding of removal, and protection under Article III of the United Nations Convention Against Torture (CAT). After careful consideration, we deny the petition.

The petitioner was admitted to the United States on July 12, 2006, pursuant to a non-immigrant J-1 cultural exchange visa, which authorized him to remain until August 10, 2006. Instead of departing, he applied for asylum, citing his Roma descent and his membership in Moldova's pro-democratic political party.[1]

An asylum officer interviewed the petitioner and referred his case to the immigration court. An Immigration Judge (IJ) held an evidentiary hearing. The petitioner appeared pro se, conceded removability, and cross-applied for asylum, withholding of removal, and protection under the CAT. Because the IJ found the petitioner's hearing testimony generally credible, we rehearse the raw facts in line with that testimony.

The petitioner attempted to recount various episodes of harassment and discrimination that had occurred in his homeland. He was threatened with expulsion from high school after he organized students in opposition to the implementation of Russian

---

[1] People of Roma ancestry are sometimes referred to (usually derisively) as gypsies. We note that fact because the petitioner claims, among other things, that he was harassed as a gypsy.

as the primary language at the school and spoke out against the Communist Party. While attending a university, a professor threatened him with a grade reduction due to his pro-democracy stance.

In March of 2004, he was beaten on a public street by several unidentified individuals, leaving him with a broken nose and fractured ribs. Although his assailants said nothing about their motives, the petitioner thought that they had attacked him because of his Roma appearance and, possibly, his political beliefs.

Roughly two weeks after the assault, the petitioner traveled to the United Kingdom for the summer. During that interval, his mother received a few telephoned threats. The anonymous caller declared that if the petitioner returned to Moldova, he would risk being prosecuted, beaten, or killed. No explanation for these threats was given by the caller, but the petitioner thought they were made because he was expressing his opinions.

Soon after the petitioner returned home, he was followed by four unknown individuals in a strange car. The quartet tried unsuccessfully to restrain him outside his apartment. He was unharmed and reported the incident to the police. The police concluded that the incident was likely the activity of some hooligans looking for money.

The following spring, plainclothes police officers detained the petitioner on suspicion of involvement in a street fight. They shoved the petitioner and escorted him to a police station, where they took fingerprints and photographs before releasing him.

Notwithstanding desultory threats, the petitioner continued to attend anti-communist demonstrations. Ten days after he participated in a May 2005 protest, he received several anonymous calls warning him to be careful because he was speaking out too much.

After his graduation from the university, the petitioner obtained employment as a teacher at a private school for the 2005-2006 academic year. He claims that, while there, he was subjected to petty harassment on account of his Roma ethnicity and his anti-communist beliefs. The petitioner repaired to the United States shortly after the end of the academic year.

The petitioner testified that he did not return to Moldova because he feared persecution on the basis of his Roma ancestry and/or political opinions. In support of this claim, he adverted to the threats and episodes of violence described above. The IJ weighed his testimony and also considered the most recent State Department country conditions report which mentioned incidents in which both persons of Roma descent and members of opposition political groups had experienced various types of

harassment in Moldova. Notwithstanding her finding that the petitioner was generally credible, the IJ concluded that he had not carried his burden of proving either past persecution or a well-founded fear of future persecution on account of a statutorily protected ground. See 8 U.S.C. § 1101(a)(42)(A); 8 C.F.R. § 1208.13(b). Consistent with these conclusions, the IJ denied the petitioner's application for asylum. She also denied his application for withholding of removal and CAT protection and entered an order of removal. The petitioner appealed to the BIA, which affirmed the IJ's decision. This timely petition for judicial review followed.

Because the BIA added its own gloss to the IJ's reasoning, we review its decision and the IJ's antecedent decision as a unit. Arévalo-Girón v. Holder, 667 F.3d 79, 81 (1st Cir. 2012). In this exercise, "we test the agency's factual findings . . . under the familiar substantial evidence rule." Id. This standard requires us to accept all findings of fact "so long as they are 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Nikijuluw v. Gonzales, 427 F.3d 115, 120 (1st Cir. 2005) (quoting INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992)). In the absence of an error of law — and we discern none here — we can set aside the agency's decision "only if the evidence 'points unerringly in the opposite

direction.'"  Id. (quoting Laurent v. Ashcroft, 359 F.3d 59, 64 (1st Cir. 2004)).

We start with the petitioner's asylum claim.  "An asylum-seeker bears the burden of proving that he is a refugee within the meaning of the immigration laws."  Jiang v. Gonzales, 474 F.3d 25, 30 (1st Cir. 2007); see 8 U.S.C. § 1158(b)(1)(B)(i).  To qualify as a refugee, an alien must demonstrate that he is unable or unwilling to return to his homeland "because of [past] persecution or a well-founded fear of [future] persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101(a)(42)(A); see Makhoul v. Ashcroft, 387 F.3d 75, 79 (1st Cir. 2004).  Once a showing of past persecution is made, "a rebuttable presumption arises that a petitioner's fear of future persecution is well-founded."  Nikijuluw, 427 F.3d at 120.

Persecution is a term of art in immigration law.  The term connotes a level of harm that "add[s] up to more than mere discomfiture, unpleasantness, harassment, or unfair treatment."  Id.  We caution, further, that "persecution always implies some connection to government action or inaction."  Harutyunyan v. Gonzales, 421 F.3d 64, 68 (1st Cir. 2005).  An alien will be found eligible for asylum only if he experiences untoward treatment that is at the hands of the government, condoned by the government, or a result of the government's unwillingness or inability to control the offending acts.  Id.

Even if an alien genuinely fears that he will be persecuted upon returning to his homeland, that subjective fear is insufficient to confer protected status. Rather, "an alien must pass both a subjective test (by showing that [he] genuinely fears persecution) and an objective test (by showing an objectively reasonable basis for that fear)." Lopez Perez v. Holder, 587 F.3d 456, 461-62 (1st Cir. 2009).

In the case at hand, the petitioner's evidence involves mostly verbal harassment during his youth, threats of scholastic discipline (e.g., expulsion and grade-reduction), and telephone calls predicting disagreeable consequences should the petitioner not modify his behavior. But the petitioner is now an adult; he has graduated without incident from both high school and college; and none of the dire predictions materialized (that is, there is no evidence to suggest that he was ever physically harmed by those who threatened him).

Citing Sok v. Mukasey, 526 F.3d 48 (1st Cir. 2008), the petitioner argues that threats alone may constitute past persecution. This is true as far as it goes — but it does not take the petitioner very far. Even though Sok stands for the proposition that threats can in some circumstances suffice to show past persecution, id. at 54-55, "the presence or absence of physical harm (and, indeed, the degree of harm inflicted) remains a relevant factor in determining whether mistreatment rises to the

-7-

level of persecution." <u>Ruiz</u> v. <u>Mukasey</u>, 526 F.3d 31, 37 (1st Cir. 2008). Thus, <u>Sok</u> cannot be read to change our settled rule that "[h]ollow threats, . . . without more, certainly do not compel a finding of past persecution." <u>Ang</u> v. <u>Gonzales</u>, 430 F.3d 50, 56 (1st Cir. 2005).

This gets the grease from the goose. The IJ found that the vague threats addressed to the petitioner, virtually all of which were conveyed over the telephone by unknown persons, were nothing more than empty words.[2] This determination was supported by substantial evidence in the record. Consequently, we must honor it.

In an attempt to create a linkage between the verbal threats and some physical harm, the petitioner alludes to the severe beating he suffered at the hands of unknown assailants and his on-the-street confrontation with some nameless men in a strange car. This linkage is woven entirely out of gossamer strands of speculation and surmise. None of these persons either spoke to the petitioner or otherwise indicated why they had targeted him. For aught that appears, both of these incidents exemplify no more than random violence.

_____

[2] This is in marked contrast to <u>Sok</u>, in which there was evidence of actual physical harm. Indeed, even the threats in <u>Sok</u> were of a different caliber than the threats here — they were threats of bodily harm that were communicated face-to-face by an armed man. <u>Sok</u>, 526 F.3d at 54-55.

The petitioner suggests that the perpetrators of these incidents targeted him because of either his Roma features or his political persuasion. He does not, however, point to any evidence, direct or circumstantial, that substantiates this suggestion. The IJ concluded that both incidents were unrelated to either the petitioner's ethnicity or his anti-communist leanings, and the empty record does not compel a contrary conclusion. See Elias-Zacarias, 502 U.S. at 481 n.1 ("To reverse [an agency] finding we must find that the evidence not only supports [a contrary] conclusion, but compels it.").

Insofar as it relies on these two incidents, the claim for asylum is deficient in another respect: the petitioner fails to show a nexus between either incident and the Moldovan government. Where, as here, "perpetrators of the alleged harms are not themselves government actors (say, police officers or soldiers), an asylum-seeker must show either that the alleged persecutors are in league with the government or are not controllable by the government." Morgan v. Holder, 634 F.3d 53, 59 (1st Cir. 2011) (alteration and internal quotation marks omitted). It follows that "abuse at the hands of a coterie of local hooligans" is not enough. Harutyunyan, 421 F.3d at 69.

The short of it is that there is no record evidence of any linkage between the Moldovan government and either of the two incidents. By the same token, there is no plausible basis for a

finding of either governmental condonation or governmental inaction. The opposite is true: to the limited extent that they were involved, the police appear to have acted impartially.

The petitioner's next claim does involve governmental actors. He strives to persuade us that his involuntary detention by the police on a different occasion evinces past persecution. We are not convinced.

The detention was short in duration, did not involve any significant use of physical force, did not result in overnight incarceration, and terminated in the petitioner's prompt release. According to the petitioner's own account, the police did not ask about either his ethnicity or his political views, nor did they say anything suggestive of a connection between his detention and any statutorily protected ground. The reason that they gave for detaining him — his suspected involvement in a brawl — was a facially neutral one, which the record does not discredit.

Deciding "whether described harms rise to the level of persecution is, except in clear cases, a judgment call." Morgan, 634 F.3d at 58. To the extent that this is a clear case, its clarity favors the government's position. Not all unpleasant experiences translate into persecution, see Rodriguez-Ramirez v. Ashcroft, 398 F.3d 120, 124 (1st Cir. 2005), and on this record, the IJ was amply justified in regarding the petitioner's brief

detention as a simple case of mistaken identity or, at worst, an isolated incident.[3]

To sum up, it was well within the agency's purview to conclude that the petitioner's experiences in Moldova, whether viewed singly or collectively, did not amount to past persecution. This conclusion, however, does not end our inquiry. An alien who has not been able to establish past persecution sometimes can make an independent showing that he has a well-founded fear of future persecution. Lopez Perez, 587 F.3d at 461; see also 8 C.F.R. § 208.13(b)(2). In this instance, the petitioner claims to fear future persecution because the police obtained fingerprints and a booking photo during his earlier detention. Thus, he says, the authorities can more easily identify him with his ethnic group and his beliefs, and he may be beaten or have difficulty finding a job as a result.

The IJ determined that this stated fear was not objectively reasonable. The petitioner's concern that his

---

[3] We have upheld an agency determination of no persecution in numerous cases involving far more egregious police conduct. See, e.g., Topalli v. Gonzales, 417 F.3d 128, 132 (1st Cir. 2005) (involving seven arrests accompanied by brief detentions and beatings); Bocova v. Gonzales, 412 F.3d 257, 261, 263 (1st Cir. 2005) (involving two beatings by the police, accompanied by death threats); Nelson v. INS, 232 F.3d 258, 264 (1st Cir. 2000) (involving three incarcerations in solitary confinement, plus physical abuse).

identifying information would be misused by the police is pure conjecture, unanchored to any evidence in the record.[4]

The petitioner's more generalized fear is that he will encounter a pattern of hostility in present day Moldova because of his Roma ethnicity or his political opinions or both. This fear is buttressed to some extent by the country conditions report, together with second-hand accounts that a number of students were killed at an anti-communist protest (although their deaths were determined to be accidental).

When an alien claims to have a well-founded fear of future persecution on the ground that persons like him face a pattern of abuse, see 8 C.F.R. § 208.13(b)(2)(iii), that claim is subject to a "demanding" standard which "requires a showing of regular and widespread persecution creating a reasonable likelihood of persecution of all persons in the group." Rasiah v. Holder, 589 F.3d 1, 5 (1st Cir. 2009); see Decky v. Holder, 587 F.3d 104, 113 (1st Cir. 2009). The agency concluded that the sporadic violence and harassment experienced by persons of Roma ancestry in Moldova is neither systematic nor pervasive enough to suggest that the petitioner would face persecution upon his return. Moreover, the

---

[4] To be sure, the petitioner points to some unidentified threats that he and his mother received as proof that he might be persecuted in the future. But there is no evidence to suggest that the nameless callers were governmental actors, and "private conduct. . . . [is] a non-factor in analyzing the prospect of future persecution." Lopez Perez, 587 F.3d at 463.

-12-

agency, at least implicitly, determined that there was no severe and widespread persecution of political dissidents in modern-day Moldova. These determinations are supported by substantial evidence: there is no compelling proof of a pattern of persecution of similarly situated persons such that the petitioner reasonably can expect to face persecution upon his repatriation.

Let us be perfectly clear. We do not mean to imply that persons of Roma ancestry or those with anti-communist views are never subjected to harassment in Moldova. But the objective reasonableness of an alien's fear depends on matters of degree, and the fact that some members of a marginalized group may encounter sporadic discrimination "does not automatically entitle all members of that minority to asylum." Rasiah, 589 F.3d at 5. The agency reasonably determined that there is no universal and systematic mistreatment of members of these groups in Moldova, and in the absence of some evidence in the record compelling findings to the contrary, the agency must be afforded considerable leeway in assessing such situations.

Here, moreover, other evidence tends to support the agency's determination. The petitioner traveled back and forth from Moldova to the United Kingdom of his own volition, and his stated fear of future persecution is undercut by his uncoerced decision to return home after reaching British soil. See Attia v. Gonzales, 477 F.3d 21, 24 (1st Cir. 2007).

We also note that the petitioner, while in his homeland, held a steady job as an English teacher.  This casts considerable doubt on his assertion that he will be unable to obtain gainful employment should he be removed to Moldova.  In the same vein, the petitioner's professed fear of ethnically based discrimination is weakened by the fact that his mother and sister continue to live and work, without apparent incident, in Moldova.  See Aquilar-Solis v. INS, 168 F.3d 565, 573 (1st Cir. 1999) (explaining that when a petitioner's "close relatives continue to live peacefully in the [petitioner's] homeland," that circumstance "undercuts the alien's claim that persecution awaits his return").

That ends this aspect of the matter.  Because the agency supportably concluded that the petitioner neither experienced past persecution nor entertained a well-founded fear of future persecution, the petitioner's asylum claim fails.

The petitioner's alternate claim for withholding of removal is easily dispatched.  That relief requires "a clear probability of persecution, rather than merely a well-founded fear of persecution."  Ang, 430 F.3d at 58.  When, as in this case, the alien has been unable to establish a well-founded fear of future persecution sufficient to warrant asylum, his evidence perforce fails to establish a clear probability of future persecution.  Consequently, the agency did not err in rejecting the petitioner's counterpart claim for withholding of removal.

We need not linger long over the petitioner's skeletal claim for CAT protection. This claim is presented only in passing, and we regularly have held that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990); accord Morgan, 634 F.3d at 60.

One loose end remains. In this venue, the petitioner argues for the first time that because he appeared pro se before the IJ, he suffered prejudice related to his lack of English language proficiency and his unfamiliarity with immigration procedures. We cannot entertain this argument: "theories not advanced before the BIA may not be surfaced for the first time in a petition for judicial review of the BIA's final order." Makhoul, 387 F.3d at 80.

We need go no further. For the reasons elucidated above, we deny the petition for judicial review.

**So Ordered.**