# United States Court of Appeals
## For the First Circuit

No. 11-1640

CARLOS ALBERTO LOBO, DARWIN ALBERTO LOBO,
CIRIA JIMENA LOBO, and KAREN VANESSA LOBO,

Petitioners,

v.

ERIC H. HOLDER, JR.,
ATTORNEY GENERAL OF THE UNITED STATES,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Torruella, Lipez, and Howard,
Circuit Judges.

Harvey J. Bazile and Bazile & Associates, on brief for
petitioners.
Nancy K. Canter, Attorney, Civil Division, Office of
Immigration Litigation, Tony West, Assistant Attorney General,
Civil Division, and Shelley R. Goad, Assistant Director, on brief
for respondent.

July 6, 2012

**TORRUELLA, Circuit Judge.** Petitioners Carlos Alberto Lobo ("Lobo") and his children (collectively, "Petitioners" or "Lobos")[1] seek review of a final order of removal issued by the Board of Immigration Appeals ("BIA") denying their applications for asylum, withholding of removal, and protection under Article III of the United Nations Convention Against Torture ("CAT"). After careful consideration, we deny their petition for review.

## I. Background

Petitioners are natives and citizens of Honduras who entered the United States without inspection on approximately October 27, 1991. We first turn our eyes to those events that transpired prior to the Lobos' border crossing, which are derived from Lobo's testimony before the immigration judge ("IJ").

Lobo and his family lived in San Pedro Sula, Honduras, where Lobo worked as a tax analyst and, following a promotion, as chief of the commercial department for the city. Lobo lived and worked there for approximately twelve to thirteen years. Lobo's job responsibilities were equivalent to those of a tax collector: he was in charge of ensuring that commercial establishments and merchants in the Municipality of San Pedro Sula properly paid their taxes on time. If a business was unable to pay its taxes, it fell to Lobo's department to arrange a payment plan for the company to assure it would not default on its payments.

---

[1] According to the record, Lobo's children are now of adult age.

Lobo's control and monitoring of commercial establishments' tax payments proved to be a demanding job. As tax evasion's shadow cast ever wider over San Pedro Sula, Lobo commonly had the responsibility of fining or closing businesses that failed to meet their tax obligations. Perhaps true to form, one of the businesses that decided to take a gamble with its tax obligations was a casino operating in the Municipality. By 1989, the casino had failed to pay its taxes for the third time in three years, the overdue payments of which totaled approximately three and a half million U.S. dollars. With potential fraud flags flying, investigations commenced, with Lobo leading the investigatory pack.

Lobo's probing uncovered the following details: the casino was managed by a woman closely associated with the Municipality,[2] and the casino was not being required to pay taxes due to continuing fraud within the relevant hierarchical governmental structure. Lobo prepared a report of his findings and conclusions and distributed it to the casino and various government entities, including the Municipality's Audit Department, Accounting Department, and Treasury Department.

The report was, to put it lightly, not well-received. Soon after Lobo's report went public, Lobo began to receive threats. In July of 1990, his boss, José Dennis Lagos ("Lagos"),

---

[2] The specifics concerning the woman's relation to the Municipality are unclear from the record.

began pressuring Lobo to make the report disappear by threatening to make his job disappear.  Lobo declined Lagos's request.  That same month, Lobo began to receive threats at his home.

Lobo testified that he received approximately five or six threats in total between July 1990 and September 1991,[3] and that sometime during the course of these threats, Lobo was fired from his job.  Lobo described his threats as follows:[4] two threats from Lagos; one threat from an attorney sent by Lagos; another threat from a woman (whose relation to Lobo or the Municipality is unclear from the record) who came to his house and aimed "a gun to [his] chest" and demanded money; and another from persons (whom Lobo believed were sent by Lagos) who came to his house and threatened Lobo and his family.  Lobo noted that the threats to his family were "not just one occasion; it was various times" before he left Honduras.  Lobo additionally testified that, after being fired from his job, he continued to receive threats at his home, whether over the phone or in person, and that immediately before he departed for

---

[3]  The majority of the threats appear from the record to have occurred sometime in or around July 1990.  When questioned as to why Lobo and his family had received threats as late as September 1991, Lobo stated "there was a reporter that was making a report regarding blackmail and bad administrations of the corporation"; when that reporter "disappeared," Lobo became targeted again as officials were afraid he might talk about his investigatory findings.  Additional specifics concerning the reporter and his disappearance are not in the record.

[4]  The specific timeline of these events is not clear from the record.

the United States, he received a threat from "an agent that worked with the dean"[5] who came to his house with a firearm.[6] Lobo stated that he never reported these warnings for fear that those responsible for the confrontations might be associated with the authorities.

By late September 1991, Lobo had reached his breaking point. Lobo left Honduras along with his three children, crossing the Mexican border and entering the United States without inspection on or about October 27, 1991.

On May 21, 1992, Lobo filed an affirmative asylum application with the Immigration and Naturalization Service ("INS"), predecessor to the United States Citizenship and Immigration Naturalization Service ("USCIS"). In 2006, an asylum officer at USCIS interviewed Lobo about his case. The officer subsequently referred his application to the Immigration Court.

On September 7, 2007, the Department of Homeland Security ("DHS") commenced removal proceedings against Petitioners, issuing a "Notice to Appear" (the "Notice") to Lobo and his three children.

---

[5] There is no clear explanation in the record as to the dean's identity or the relevance of this position.

[6] Lobo testified that sometime during the July 1990-September 1991 period a man came to his house, threatening to kill him and his family unless he signed a document promising that Lobo would not reveal any of the information he had uncovered during his investigation. It is not clear from the record whether this man is the same one who came to his house with the firearm immediately prior to Lobo's U.S. departure, or whether he was a different harasser.

The DHS charged Lobo and his children under § 212(a)(6)(A)(i) of the Immigration and Nationality Act as aliens present in the United States without having been admitted or paroled following inspection. The Notice stated that Lobo and his children, citizens of Honduras, had illegally entered the United States via Texas on approximately October 27, 1991.

On January 15, 2008, Petitioners appeared before the IJ. At the hearing, Petitioners admitted all facts, conceded removability, and acknowledged they would be seeking asylum, withholding of removal, and protection under CAT.[7] Lobo also testified at the hearing, recounting the aforementioned events underlying his reasons for fearing return to Honduras.

On April 28, 2009, the IJ, having considered Petitioners' applications and Lobo's testimony, denied their applications and ordered their removal. The IJ concluded that Lobo had failed to establish past persecution or a well-founded fear of future persecution to qualify for asylum. Specifically, the IJ determined that Lobo's evidence did not rise to a level sufficient to constitute persecution. The IJ stated that no evidence showed the threats Lobo received were likely to be carried out; no harm in fact befell any of the Lobos during the over year-long threat period; and no evidence showed that others in Honduras had been

---

[7] Lobo was the lead respondent. His children's claims were derivative of his asylum application. See 8 U.S.C. § 1158(b)(3)(A).

-6-

harmed for failure to remain quiet in the face of corrupt business activities -- with the exception of Lobo's reference to a missing reporter, which the IJ deemed too lacking in proof to be of any weight in Lobo's case. Additionally, the IJ noted that Lobo had not been active in Honduran politics prior to leaving, and his five brothers and mother had remained living in Honduras unharmed, despite Lobo's contention that individuals, from time to time, asked as to his whereabouts (which Lobo asserted served as proof of an ongoing risk to his life and safety).

As to the withholding of removal claim, the IJ held that because Lobo could not establish a claim for asylum, he could not meet the higher standard of proof needed to make out a claim for withholding of removal; the IJ thus denied this claim as well. The IJ similarly denied Lobo's request for CAT relief, finding that Lobo had failed to offer any proof that he risked facing torture should he return to Honduras. Lastly, the IJ denied the remaining Lobos' applications, stating that because "each of the co-respondents is older than [twenty-one]," they "no longer ha[ve] a viable claim for derivative asylum in any event."

On May 9, 2011, the BIA affirmed the IJ's decision dismissing Petitioners' appeal.[8]  Lobo then timely filed a petition for review with this court.

## II.  Discussion

We begin with the applicable standard of review.  Because the BIA here offered its own elucidations upon the IJ's reasoning, we review both decisions "as a unit."  Arévalo-Girón v. Holder, 667 F.3d 79, 81 (1st Cir. 2012).  Our review requires us to adopt both a deferential and de novo stance.  Id. at 81-82.  On the one hand, we apply the "substantial evidence" standard and defer to those findings of fact that are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Nikijuluw v. Gonzales, 427 F.3d 115, 120 (1st Cir. 2005) (quoting I.N.S. v. Elias-Zacarias, 502 U.S. 478, 481 (1992)) (internal quotation marks omitted).  On the other hand, we review anew all legal conclusions, "with appropriate deference to the agency's interpretation of the governing statute."  Sok v. Mukasey, 526 F.3d 48, 53 (1st Cir. 2008).  In the end, we may only set aside the agency's determination if the "evidence points unerringly in the opposite direction."  Laurent v. Ashcroft, 359 F.3d 59, 64 (1st Cir. 2004); see also Castillo-Díaz v. Holder, 562 F.3d 23, 26 (1st

---

[8]  The BIA expressly noted that it would "not reach the [IJ's] additional determination that as adult asylum applicants, the co-respondents are ineligible to obtain derivative asylum based on their father's asylum application."

Cir. 2009) (noting reversal of agency decision only warranted if a "reasonable adjudicator would be compelled to conclude to the contrary" (quoting 8 U.S.C. § 1252(b)(4)(B)) (internal quotation marks omitted).

The evidentiary burden here lies with Lobo to show that he is a refugee under the immigration laws. See 8 U.S.C. § 1158(b)(1)(B)(i); Nikijuluw, 427 F.3d at 120. To establish such qualification for asylum, Lobo must demonstrate that he is unable to go back to Honduras due to "[past] persecution or a well-founded fear of [future] persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Hasan v. Holder, 673 F.3d 26, 30 (1st Cir. 2012) (quoting 8 U.S.C. § 1101(a)(42)(A)) (internal quotation marks omitted); see also Guerrero v. Holder, 667 F.3d 74, 77 (1st Cir. 2012). If a petitioner (here, Lobo) clears the past persecution hurdle, he "creates a rebuttable presumption that a well-founded fear of future persecution [also] endures." Guerrero, 667 F.3d at 77; 8 C.F.R. § 1208.13(b)(1).

Persecution, a term of a more elusive character due to its lack of a specific definition under the Immigration and Nationality Act, is better clarified by precedent. See Nikijuluw, 427 F.3d at 120 ("The Immigration and Nationality Act provides no precise definition of 'persecution[,]'" but "[t]he case law . . . is more informative"). We have held that the term

-9-

"'encompasses more than threats to life or freedom, but less than mere harassment or annoyance.'"  Sok, 526 F.3d at 53 (quoting Aquilar-Solís v. I.N.S., 168 F.3d 565, 570 (1st Cir. 1999)).  That is, the totality of the harm suffered must "add up to more than mere discomfiture, unpleasantness, harassment, or unfair treatment."  Morgan v. Holder, 634 F.3d 53, 58 (1st Cir. 2011) (quoting Nikijuluw, 427 F.3d at 120) (internal quotation mark omitted).  Additionally, the source or administration of such harm must trace back -- at least on some level -- to governmental action or omission.  See Jorgji v. Mukasey, 514 F.3d 53, 57 (1st Cir. 2008) (noting "the state must be the source of or at least acquiesce in the persecution"); Harutyunyan v. Gonzales, 421 F.3d 64, 68 (1st Cir. 2005) ("[P]ersecution always implies some connection to government action or inaction.").

Having laid the relevant legal groundwork, we turn to the agency's determination that Lobo did not suffer past persecution. We conclude that the agency's decision passes the substantial evidence test.

Lobo anchors his claim of past persecution in the approximately five (or six) incidents of threats or extortions Lobo testified to receiving following his casino investigation in Honduras recounted above.  Threats to one's job, personal safety, or family are without question highly unsettling and tension-inducing.  And while it is true that a showing of threats may be

sufficient to establish past persecution, "the presence or absence of physical harm (and, indeed, the degree of harm inflicted) remains a relevant factor in determining whether mistreatment rises to the level of persecution."  Gilca v. Holder, No. 11-1711, 2012 WL 1867125, at *3 (1st Cir. May 23, 2012) (quoting Ruíz v. Mukasey, 526 F.3d 31, 37 (1st Cir. 2008)) (internal quotation marks omitted).

Here, the IJ found (with the BIA largely adopting its findings) that Lobo's received threats did not rise to the level of persecution because no evidence showed or suggested that such threats ever were at risk of being carried out, and the threats occurred over the course of an approximately year-long period, with no harm ever befalling any of the Lobos.  We have recognized that "[h]ollow threats, . . . without more, certainly do not compel a finding of past persecution," Gilca, 2012 WL 1867125, at *3 (quoting Ang v. Gonzales, 430 F.3d 50, 56 (1st Cir. 2005)), and that "the absence of evidence of physical harm [may] plainly support[] the BIA's determination that nothing tantamount to persecution transpired."  Ruíz, 526 F.3d at 37.  Given the lack of credibility or impendency to the threats at issue, including the absence of any harm actually betiding the Lobos, the evidence does not compel a disturbance of the agency's conclusion.  See Elias-Zacarias, 502 U.S. at 481 n.1 (stating "[t]o reverse the BIA

-11-

finding we must find that the evidence not only supports the conclusion, but compels it") (emphasis in original).

Moreover, the IJ noted that Lobo's testimony as to such incidents contained inconsistencies (including the nature and number of threats actually received, and the identities of those responsible for ordering or issuing such threats) that, while not sufficient to warrant an adverse credibility finding, made it difficult to fully credit his testimony or to uphold his claim without further corroboration.[9] For instance, although Lobo testified that at least one of his received warnings occurred at gunpoint with an accompanying threat of death or harm, the IJ found such testimony to be inconsistent and lacking proof as to the plausibility of its actually being effectuated. Cf. Gilca, 2012 WL 1867125, at *3 & n.2. While any such warning is indubitably unsettling, "credible verbal death threats may fall within the meaning of 'persecution[]' . . . only when the threats are 'so menacing as to cause significant actual suffering or harm.'" Vilela v. Holder, 620 F.3d 25, 29 (1st Cir. 2010) (internal citation omitted) (quoting Bonilla v. Mukasey, 539 F.3d 72, 77 (1st

_____

[9] Additional proof that the IJ highlighted as missing from the record but that would have been useful in assessing Lobo's claim included evidence that he had worked for the Municipality of San Pedro Sula, letters from his mother or siblings who had continued to live in Honduras confirming the nature of such threats, news articles or other documentation regarding possible investigations into Lobo's former employer, or information concerning the alleged missing reporter that Lobo referenced in his testimony.

Cir. 2008)). As the IJ determined and BIA echoed, the threats here were not "sufficiently credible or imminent" to constitute persecution under applicable case law. Ravix v. Mukasey, 552 F.3d 42, 46 (1st Cir. 2009).

Lobo's past persecution claim is deficient on another ground. The record here is devoid of evidence showing that the threats Lobo received were linked to a statutorily protected ground, i.e., "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). The IJ rejected Lobo's claim that he was being targeted based on political opinion or membership in a particular group, noting (as to the former) that Lobo was not active in Honduran politics and had not belonged to a Honduran political party, and (as to the latter) that Lobo had failed to specify as to which social group he might belong -- a gap in the application that only Lobo could fill.[10] The absence of any evidence that Lobo was targeted on the basis of a protected ground, coupled with his failure to proffer evidence showing harm amounting to persecution,

---

[10] We additionally note without comment the IJ's statement that "[a]lthough the Court is not willing to supply the social group on which [Lobo] apparently relies, the Court notes that non-criminal informants who passed on information do not constitute a particular social group."

-13-

serves, here, as the tolling bell for Lobo's past persecution claim.[11]

In sum, the agency's determination that Lobo could not show past persecution was supported by substantial evidence. Whether the underlying threats are viewed in isolation or the collective, it was well within the agency's aegis to conclude that such acts did not amount to past persecution.

Because we affirm the agency's determination as to past persecution, Lobo's asylum claim now rests upon whether he can independently establish that he has a well-founded fear of future persecution. Nikijuluw, 427 F.3d at 121; see also 8 C.F.R. § 208.13(b)(2). To make such a showing, Lobo must traverse two pathways: he "must demonstrate not only that [he] harbors a genuine fear of future persecution but also that [his] fear is objectively reasonable." Negeya v. Gonzales, 417 F.3d 78, 82-83 (1st Cir. 2005). The IJ determined, and the BIA agreed, that while Lobo may subjectively fear returning to Honduras, his stated fear was not objectively reasonable.

Specifically, the IJ noted that approximately two decades had passed since Lobo had left Honduras. Cf. Chávez-Oliva v.

---

[11] Although Lobo did establish a link to governmental action -- as the threats at issue came from his former employer (a government employee) or individuals acting at his employer's direction -- Lobo's past persecution claim cannot stand on this leg alone. See e.g., 8 U.S.C. § 1101(a)(42)(A); López Pérez v. Holder, 587 F.3d 456, 462 (1st Cir. 2009).

Gonzales, 190 F. App'x 6, 12 (1st Cir. 2006) (noting that petitioner's absence from country for over a decade "significantly decrease[d] the likelihood that he would be harmed on account of" an alleged statutory ground). Although Lobo testified that the persons who threatened him still held government positions and were presently under investigation in Honduras, the IJ and BIA noted Lobo's failure to provide any evidence in support of this contention, aside from unsubstantiated references to "news that [he's] seen through the computer" and uncorroborated, out-of-court statements from family members. We agree with the agency's determination that this evidence -- or lack thereof -- does not rise to the level of specific proof generally required to establish an objectively reasonable fear of future persecution. See, e.g., Castillo-Díaz, 562 F.3d at 26 (stating "an alien can demonstrate directly her well-founded fear of future persecution [where no rebuttable presumption is established] through an offer of 'specific proof'" (quoting Romilus v. Ashcroft, 385 F.3d 1, 6 (1st Cir. 2004))); see also Mukamusoni v. Ashcroft, 390 F.3d 110, 120 (1st Cir. 2004) (noting that "[t]he subjective test [of establishing a well-founded fear of future persecution] requires the applicant to prove his fear is genuine, while the objective test requires showing by credible and specific evidence that this fear is reasonable").

Moreover, the IJ reasoned, and the BIA agreed, that the fact that Lobo's mother and siblings had continued to live in Honduras following Lobo's departure, without suffering any harm aside from alleged inquiries from others as to Lobo's current whereabouts, weighed against a finding of persecution sufficient to qualify for asylum. We have often echoed that "[t]he fact that close relatives continue to live peacefully in the alien's homeland undercuts the alien's claim that persecution awaits [his] return." Budiono v. Mukasey, 548 F.3d 44, 50 (1st Cir. 2008) (quoting Ly v. Mukasey, 524 F.3d 126, 133 (1st Cir. 2008)); see also Decky v. Holder, 587 F.3d 104, 112-13 (1st Cir. 2009); López Pérez, 587 F.3d at 463; Aguilar-Solís, 168 F.3d at 573. Although by no means an outcome-determinative factor, we repeat that chorus here where no evidence compels us to find, contrary to the agency, that Lobo has a well-founded fear of future persecution. We thus affirm the agency's rejection of Lobo's claim of a well-founded fear of future persecution, finding it to be supported by substantial evidence.

Lobo's remaining claims fare no better. Turning first to his withholding of removal claim, we note that a "petitioner's quest for withholding of removal . . . carries with it a more stringent burden of proof than does a counterpart effort to obtain asylum." Orelien v. Gonzales, 467 F.3d 67, 73 (1st Cir. 2006); see also Ang, 430 F.3d at 58 ("Withholding of removal requires that an alien establish a clear probability of persecution, rather than

merely a well-founded fear of persecution."). Thus, if a petitioner cannot meet the lesser burden for establishing eligibility for asylum, then, sure as night follows day, so too will it hold true that he will be unable to satisfy the higher standard for withholding of removal. Zheng v. Gonzales, 416 F.3d 97, 101 n.3 (1st Cir. 2005); see also Bocova v. Gonzales, 412 F.3d 257, 264 (1st Cir. 2005). Because we uphold the agency's denial of Lobo's asylum claim, his withholding of removal claim thus falls by the wayside.

Lastly, addressing Lobo's CAT claim, we find no grounds on which to quibble with the agency's denial-of-redress determination. In brief, under the CAT, the United States may not return an alien to his country of nationality if "there are substantial grounds for believing [he] would be in danger of being subjected to torture." Pub. L. No. 105-277, § 2242, 112 Stat. 2681, 2681-822 (1998). The petitioner (here, Lobo) must shoulder the burden of establishing that it is more likely than not that he will be tortured on returning to his homeland. See Hasan, 673 F.3d at 35; 8 C.F.R. § 208.16(c)(2). Applicable regulation defines torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1).

Both the IJ and BIA found that Lobo offered no evidence showing he had been tortured or even physically harmed when living in Honduras. The most Lobo did proffer -- the unsupported posit that his boss was directed by the Municipality of San Pedro Sula to send imminent death and physical harm threats to Lobo -- does not show that Lobo "more likely than not" will be tortured by the government on returning to Honduras. See Ang, 430 F.3d at 58 (noting "vague threats" by political adversaries did not rise to the level of torture); see also Orelien, 467 F.3d at 73 (rejecting petitioner's CAT claim on grounds that he "proffered no evidence of physical harm directed against him while" in his home country, nor did he show evidence, "either direct or circumstantial, that he will be tortured at the hands of the government" should he return). In the absence of any evidence supporting Lobo's claim that government-sanctioned torture more likely than not awaits him on his return to Honduras, we must affirm the agency's refusal of relief under the CAT.[12]

### III. Conclusion

With no remaining claims before us, our review comes to an end. For the reasons expounded above, we deny Lobo's petition for judicial review.

---

[12] Both the IJ and BIA determined that the remaining Lobos' claims for withholding of removal and CAT protection, derivative of their father's claims (which were denied), likewise failed. We see no evidence compelling us to disturb the BIA and IJ's conclusions.