# United States Court of Appeals
## For the First Circuit

No. 12-2055

MING CHEN,

Petitioner,

v.

ERIC H. HOLDER., JR., Attorney General,

Respondent.

PETITION FOR REVIEW FROM AN ORDER OF THE
BOARD OF IMMIGRATION APPEALS

Before

Lynch, Chief Judge,
Howard and Thompson, Circuit Judges.

Zhong Yue Zhang, a/k/a John Z. Zhang, on brief for petitioner.
Lori B. Warlick, Trial Attorney, Office of Immigration
Litigation, Stuart F. Delery, Principal Deputy Assistant Attorney
General, and Melissa Neiman-Kelting, Senior Litigation Counsel,
Office of Immigration Litigation, on brief for respondent.

July 9, 2013

**HOWARD, <u>Circuit Judge</u>**.  Ming Chen, a native and citizen of the People's Republic of China, petitions this court for review of the Board of Immigration Appeal's ("BIA") order denying his motion to reopen removal proceedings as untimely.  Because Chen failed to satisfy any of the exceptions to the time limit for a motion to reopen, we deny his petition.

**I.**

Chen entered the United States with a fraudulent passport in June 1997.  In January 1998, the legacy Immigration and Naturalization Service served him with a Notice to Appear ("NTA").  The NTA alleged that Chen had entered the United States through fraud or willful misrepresentation, and did not otherwise have a valid immigration entry document, rendering him removable under 8 U.S.C. § 1227(a)(1)(A).  Chen submitted an application for asylum and withholding of removal.  He claimed that he had been persecuted by the Chinese authorities as the second of three children born to his parents, in violation of China's one-child policy.  An immigration judge denied this relief in September 1998.  The BIA affirmed this decision in August 2002, and Chen did not seek further review.

Although the next step should have been Chen's removal from the United States, he remained in the country for another nine years.  He resurfaced in 2011 to file a motion to reopen his removal proceedings.  Attached to this motion to reopen was a

successive application for asylum and withholding of removal based on Chen's membership in the China Democracy Party ("CDP"). According to the materials submitted in support of the application, Chen had joined the CDP in 2010 and Chinese government officials had become aware of his political activity in early 2011, exposing him to the risk of persecution if he returned to China. He submitted a letter, purportedly written by his mother, describing how two government officials had visited her home in China to ask questions about Chen's political advocacy. According to her account, they told her that Chen would face imprisonment if he returned to China.

Though Chen's motion to reopen fell well outside the ninety-day deadline set forth in the regulations, see 8 C.F.R. § 1003.2(c)(2), Chen argued that his motion was based on changed country conditions in China and therefore the deadline was inapplicable, id. § 1003.2(c)(3)(ii). In particular, he noted that the Chinese government had not initiated crackdowns against the CDP until November 1998 -- after his last hearing in September 1998 -- and consequently the persecution of CDP members was by definition a changed country condition. Additionally, he claimed that the Chinese government had moved to suppress pro-democracy groups beginning in 1998 and continuing to the present. Those against whom these actions allegedly have been taken include members of groups operating in the United States who later returned to China.

In March 2012, the BIA denied Chen's motion to reopen as untimely, concluding that he had not demonstrated changed country conditions that would exempt his motion from the deadline imposed in the regulations. It first determined that the letter from Chen's mother lacked indicia of reliability to prove changed country conditions, since the letter was not notarized and, even if it was authentic, it came from "an interested party not subject to examination."[1] The BIA further held that Chen's involvement in the CDP only constituted a change in his personal circumstances, and not a change in country conditions.

The BIA next looked to the broader claim that conditions had worsened for the CDP and democracy activists since 1998. Since the CDP had only recently come into existence at the time of Chen's last immigration hearing, the BIA looked at the conditions for democracy activists in general and found that "the treatment of pro-democracy activists at the time of the respondent's last hearing was similar to that described in [the latest country report]." It concluded that, "to the extent that the respondent's motion is not based on a change in his personal circumstances, we nonetheless do not find the respondent has met his burden of

---

[1] The BIA incorrectly referred to Chen's father as the author of this letter. Chen has not raised any issue relating to this mistake. In fact, his brief also mistakenly identifies his father as the author of the letter. This error is not relevant to our decision.

-4-

showing material, changed conditions in China."  The BIA denied his motion to reopen, and he petitioned us to review this decision.

## II.

The BIA has "broad discretion, conferred by the Attorney General, to 'grant or deny a motion to reopen.'"  Kucana v. Holder, 558 U.S. 233, 250 (2010) (quoting 8 C.F.R. § 1003.2(a)). Accordingly, we review the BIA's denial of Chen's motion to reopen for abuse of discretion.  Smith v. Holder, 627 F.3d 427, 433 (1st Cir. 2010).  Under this standard, "we uphold the agency's subsidiary findings of fact as long as they are supported by substantial evidence, we review embedded legal conclusions de novo, and we review judgment calls for abuse of discretion."  Id. (quoting Vaz Dos Reis v. Holder, 606 F.3d 1, 3 (1st Cir. 2010)) (internal quotation marks omitted).  Chen's motion to reopen indisputably fell outside of the time limits prescribed in 8 C.F.R. § 1003.2(c)(2).  The question is whether Chen qualifies for an exception to the time limit because his motion is "based on changed circumstances arising in the country of nationality . . . [that are] material and . . . could not have been discovered or presented at the previous hearing."  8 C.F.R. § 1003.2(c)(3)(ii).

Chen's evidence of changed country conditions falls into two categories:  1) evidence that he has become a target of the government since he joined the CDP; and 2) evidence that since 1998 the Chinese government has cracked down on the CDP and pro-

-5-

democracy groups more generally. The first category of evidence cannot sustain a showing of changed country conditions; it only indicates a change in Chen's personal circumstances. "Under the case law, a change typically will be categorized as a change in personal circumstances, as opposed to a change in country circumstances, if the change is self-induced." Larngar v. Holder, 562 F.3d 71, 76 (1st Cir. 2009). This prevents aliens from repeatedly reopening their removal proceedings based on changes that are within their control. See Wang v. B.I.A., 437 F.3d 270, 274 (2d Cir. 2006) ("[I]t would be ironic, indeed, if petitioners like Wang, who have remained in the United States illegally following an order of deportation, were permitted to have a second and third bite at the apple simply because they managed to marry and have children while evading authorities."). This rule applies even if the change in personal circumstances will expose the alien to persecution in his home country. See Khan v. Attorney Gen. of U.S., 691 F.3d 488, 497 (3d Cir. 2012) (holding that a petitioner's decision to join the Awami National Party was a change in personal circumstances, despite evidence that ANP members are targeted in Pakistan).

The evidence shows that any risk that Chen faces in China is not because of changes within that country, but due to his personal decision to engage in political activism. Chen began advocating for democratic reform in 2010. In 2011, Chinese

-6-

government officials allegedly visited his parents' home and threatened to arrest Chen because "he joined the reactionary organization -- China Democracy Party in the United States." This account, coupled with the lack of any threats prior to 2010, supports only the conclusion that the government was responding to Chen's nascent political activity. We need not question the sincerity of Chen's civil disobedience; even assuming that Chen joined the CDP out of a desire to change China's political institutions, he did so long after the United States had ordered him removed. He knew, or should have known, that he could not legally remain in this country, and that he would be returned to China. His decision to join the CDP was made in light of that probability. That decision, therefore, cannot, by itself, form the basis of a motion to reopen his removal proceedings after the deadline has passed.[2]

Rather than address this defective proof of changed conditions, Chen focuses his argument on the second category of evidence that he presented to the BIA -- evidence that the Chinese government has cracked down on democracy activists since 1998. The articles and documents that Chen submitted do not paint a flattering picture of the Chinese government's treatment of pro-democracy groups. Taken at face value, they show that the Chinese

---

[2] Because we reach this conclusion assuming the truthfulness of Chen's evidence, we need not address the BIA's finding that the letter from Chen's mother lacked reliability.

-7-

government has <u>consistently</u> targeted and suppressed pro-democracy activists since well before 1998. According to Chen's submissions, Chinese citizens who openly criticize their government regularly face harassment, detention, and "re-education," and the submissions indicate that little has changed to this day. At the very least, the documents Chen provided do not "point[] unerringly" to a finding that Chinese policy materially changed since before Chen's application was adjudicated. <u>Gilca</u> v. <u>Holder</u>, 680 F.3d 109, 114 (1st Cir. 2012) (quoting <u>Nikijuluw</u> v. <u>Gonzales</u>, 427 F.3d 115, 120 (1st Cir. 2005)) (internal quotation marks omitted). Thus, the BIA's factual finding as to conditions in China is backed by substantial evidence.

This is true even considering the Chinese government's alleged treatment of the CDP in particular. According to Chen, the relevant change in country conditions is a "crackdown" that the Chinese government initiated against the CDP in November 1998. Chen's argument glosses over a salient point: the CDP was, at that time, only a fledgling pro-democracy group. The record shows that the CDP first applied for registration with the Chinese government in June 1998. The government promptly rejected that application and began arresting CDP leaders only months later. Accordingly, the "crackdown" against the CDP would not have constituted a material change in country conditions; at most it

-8-

would be an example of the Chinese government swiftly suppressing a newly organized group.

To the extent that Chen suggests that the founding of the CDP, by itself, constitutes a changed material condition within China, we reject that argument. The treatment of particular groups is certainly relevant to assessing country conditions. But when, as here, a new political group advances a cause that other groups have already advanced and receives the same harsh treatment as the prior advocacy groups, the group's formation alone does not constitute a changed country condition.

Similarly, Chen's allusion to the Chinese government's alleged recent efforts to silence Internet dissent does not demonstrate changed country conditions. The Internet has emerged as an effective tool for dispersing ideas in authoritarian societies, and the Chinese government's purported desire to control that medium is entirely consistent with its general approach toward pro-democracy activism. See Qing Chen v. Attorney Gen. of U.S., 428 F. App'x. 212, 215 (3d. Cir. 2011) (per curiam) ("[T]he Chinese Government's efforts to control activism via the internet [are] merely part of its ongoing history of suppressing dissent and controlling the dissemination of barred ideas and material." Indeed, Chen submitted a 1997 State Department report that noted an existing law prohibiting Internet activities that incite "division of the country." U.S. Department of State, China Country Report on

<u>Human Rights Practices for 1997</u> 8 (1998). In sum, we uphold the BIA's finding that country conditions have not materially changed within China.

## III.

The BIA's refusal to reopen was not an abuse of its discretion. Accordingly, Chen's petition for review is **<u>denied</u>**.